[No. A122511. First Dist., Div. Three. Sept. 3, 2010.]

CALIFORNIA OAK FOUNDATION et al., Plaintiffs and Appellants, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents.

230

232

238

**Counsel**

Law Offices of Stephan C. Volker, Stephan C. Volker and Joshua A. H. Harris for Plaintiffs and Appellants.

Reed Smith, Paul D. Fogel, Dennis Peter Maio; Charles F. Robinson, Eric K. Behrens, Kelly L. Drumm; Sanger & Olson, John M. Sanger, Charles R. Olson; Belzer, Hulchiy & Murray, Nicholas P. Hulchiy; and Steven Barry Piser for Defendants and Respondents.

## OPINION

**JENKINS, J.**—Appellants challenge the judgment entered after the trial court denied their petition for writ of mandate (petition).[1] In that petition, appellants sought to compel the Regents of the University of California (Regents) to rescind certification of an environmental impact report (EIR) prepared for seven related projects at the University of California, Berkeley (University), and its approval of the proposed Student Athlete High Performance Center (Athlete Center), the first phase of one such project.[2] On appeal, appellants contend the Regents violated two statutes in certifying the EIR and approving the Athlete Center: the Alquist-Priolo Earthquake Fault Zoning Act (Alquist-Priolo Act), Public Resources Code section 2621 et seq., and the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.[3]

■ For reasons soon explained, we conclude the Regents complied with both statutes in certifying the EIR and approving the Athlete Center project. Specifically, we conclude that, while the Athlete Center is subject to the Alquist-Priolo Act based on its proposed location within an earthquake fault zone, the Regents could properly find the Athlete Center will not be an "addition" or "alteration" to the University's California Memorial Stadium (Stadium), as defined by the statute, and thus is not subject to the statute's value restriction on certain projects coming within those definitions. We further conclude the Regents acted in accordance with CEQA in certifying the EIR because it contains sufficient information regarding the projects'

---

[1] Appellants are the California Oak Foundation, Save the Oaks at the Stadium, McGee-Spaulding-Hardy Historic Interest Group, Dona Spring, Doug Buckwald, Sarah Shumer, Henry Norr, Lindsay Vurek, Patricia Edwards, Anna Marie Taylor, Stan Sprague, and Carrie Sprague (collectively, appellants). The Panoramic Hill Association, a former appellant, reached a settlement with the University after briefing in this matter was completed. Accordingly, the appeal with respect to the Panoramic Hill Association was dismissed by this court on April 5, 2010.

[2] "EIR" as used herein refers to the final version of the EIR that was certified by the Regents. "DEIR" refers to the draft version of the same document that was circulated for public review prior to its certification.

[3] Unless otherwise stated, all statutory citations herein are to the Public Resources Code. The administrative guidelines promulgated by the State Mining and Geology Board to implement the Alquist-Priolo Act (Cal. Code Regs., tit. 14, § 3600 et seq.), and by the Governor's Office of Planning and Research for adoption by the Secretary for Resources to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.), are referred to as "Guidelines section . . . ." We need not decide for purposes of this appeal whether the Guidelines are binding on the courts. At a minimum, as the parties implicitly acknowledge, the Guidelines are entitled to great weight so long as they are not clearly unauthorized or erroneous. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*); *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard Area*).)

likely environmental impacts, as well as feasible alternatives to or mitigation measures for those projects to avoid or minimize the identified impacts. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants brought the underlying action against the Regents under the Alquist-Priolo Act and CEQA, challenging the Regents' approval of the Athlete Center project, the first phase of the California Memorial Stadium Seismic Corrections and Program Improvements Project (Stadium project), and certification of the EIR for the University's Southeast Campus Integrated Projects (Integrated Projects). The following facts are relevant to this challenge.

### I. *The Integrated Projects.*

The Integrated Projects include each of the following seven projects proposed for the southeast quadrant of the University's campus between the years 2006 and 2012: (1) the Stadium project, involving both new construction and seismic corrections and renovations; (2) the Maxwell Family Field Parking Structure and Sports Field, involving a new underground parking facility for up to 911 vehicles with a roof level sports field; (3) the Law and Business Connection Building, involving construction of a new 180,000-square-foot building linking collaborative law and business school programs; (4) the Southeast Campus and Piedmont Avenue Landscape Improvements, involving landscape renovations to enhance views of the Stadium and to improve and enhance opportunities for interaction of people, bicycles and vehicles in the southeast campus; (5) the HAAS School of Business Program Improvements and (6) the Boalt Hall School of Law Program Improvements, both of which involve interior building changes designed to improve use of space and to improve access and transparency between the new Law and Business Connection Building and existing buildings; and (7) the Renovation and Restoration of 2222 to 2240 Piedmont Avenue, involving renovation and restoration of five residential houses to enhance appreciation for the historic character of those structures.

The Stadium project, consisting of three phases, is the first of the Integrated Projects scheduled to proceed. Phase I involves construction of the Athlete Center, a multilevel, 158,000-square-foot structure immediately to the west of the Stadium. The Athlete Center is designed to accommodate 13 varsity sports in addition to men's football, and to provide training and program space for about 450 athletes. The Athlete Center is intended not only to address long-standing deficiencies in the quantity and quality of the University's athlete training and development facilities, but also to provide

space for occupants currently housed in the Stadium. By moving these occupants out of the Stadium in phase I, the University would be able to proceed with phases II and III, which involve renovation and seismic retrofitting of the Stadium.

The Stadium, built in 1923, is one of the University's most treasured assets, and has been nominated to the National Register of Historic Places. The Stadium sits astride the Hayward Fault, at the point where the Hayward Fault intersects with the Louderback Fault. For many years, the University and various outside consultants have warned about earthquake-related public safety risks stemming from the Stadium's location, and have recommended various seismic upgrades, as the Stadium presents a seismic risk for all users, including daily and game-day occupants. In 1997, the Stadium was rated seismically "poor" under the University's seismic evaluation guidelines.

To address these concerns, phase II involves seismic upgrades to the west side of the Stadium, in addition to construction of a new press box and installation of permanent lighting above the Stadium's west rim. Phase III involves seismic upgrades to the east side of the Stadium and construction of new seating above the Stadium's east rim.

According to the University's plan, phase I was scheduled to begin in January 2007 and to be completed in September 2009. Planning and construction for phases II and III would then begin once the Athlete Center was completed and occupied.

Consistent with this schedule, only phase I was presented to the Regents for approval in conjunction with certification of the EIR. Phases II and III, along with the remaining Integrated Projects, were to be presented to the Regents for budget and design approval at a later date, at which time the Regents would also decide whether additional CEQA environmental review was necessary.

II. *The EIR Process and Certification.*

Collectively, the Integrated Projects are part of a larger plan for developing the University's campus in the near future. Prior to 2005, the Regents initiated the UC Berkeley 2020 Long Range Development Plan. In January 2005, the Regents certified the UC Berkeley 2020 Long Range Development Plan EIR (2020 LRDP EIR). The 2020 LRDP EIR, according to the Regents, "describes the scope and nature of development proposed to meet the goals of the University through academic year 2020–2021, as well as land use principles and policies to guide the location, scale and design of individual capital projects."

The Integrated Projects are designed to provide about 20 percent of the new gross square footage and 24 percent of projected new parking anticipated by the 2020 LRDP EIR. In compliance with CEQA, the University determined the Integrated Projects could have significant impacts on the environment and that an EIR, independent from the 2020 LRDP EIR, was therefore necessary. Thus, the EIR at the heart of these proceedings was prepared.

According to the University, the EIR "provides a project-level analysis of the [Integrated Projects] and is tiered from the 2020 LRDP EIR."[4] The EIR's preparation began with a notice of preparation and initial study of the EIR, which was circulated on November 14, 2005. A 30-day review period for the initial study was then held from November 15, 2005, to December 14, 2005, during which time the University received written and oral comments from the public that were taken into consideration when the DEIR was prepared.

The DEIR analyzed potential significant environmental impacts of the Integrated Projects with respect to the following issue areas: aesthetics; cultural resources; geology, seismicity and soils; hydrology and water quality; land use; noise; public services; emergency access; transportation and traffic; utilities; and wastewater, storm water and steam/chilled water construction.[5] The DEIR also proposed various mitigation measures and project alternatives to address the identified impacts. The DEIR ultimately concluded that, by the Regents' implementing the proposed mitigation measures, most of the projects' significant impacts would be reduced to less than significant levels.

The University circulated the DEIR for public review from May 8, 2006, until July 7, 2006, longer than the 45 days required by section 15105 of the Guidelines. On June 6, 2006, the University held a public hearing, at which 23 people provided comments on the DEIR. In addition, the University received written comments from eight public agencies and 55 organizations and individuals, as well as two petitions with a combined total of over 1,000 signatures. Concerns raised by these comments and petitions related primarily to the following topics: seismic and structural safety; impacts on cultural resources; and impacts of expanded use of a renovated Stadium on, among other things, emergency planning and services, noise and lighting.

---

[4] "Tiering," as will be discussed in more detail below, is "the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . ." (Guidelines, § 15385.) "Future environmental documents may incorporate by reference general discussions from the broader EIR, but a separate EIR is required for later projects that may cause significant environmental effects inadequately addressed in the earlier report." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1173 [77 Cal.Rptr.3d 578, 184 P.3d 709], citing Guidelines, § 15152, subds. (a) & (f).)

[5] Based on its initial study, the University determined the Integrated Projects' potential environmental impacts had been adequately addressed in the 2020 LRDP EIR with the exception of the issue areas referenced here.

The subsequently prepared EIR includes all public comments received by the University during the DEIR's review period, a transcript of the June 2006 hearing, written responses to the public comments, and revisions based on those comments. Like the DEIR, the EIR concludes that, by the Regents' implementing the proposed mitigation measures, most of the Integrated Projects' significant environmental impacts would be reduced to less than significant levels. The EIR further concludes, however, that in the following areas significant impacts could not feasibly be mitigated: impacts to the aesthetics of Gayley Road and Panoramic Hill; impacts to the historical significance of the Stadium and Maxwell Family Field; potentially significant impacts to historical resources at the site of the Law and Business Connection Building and Piedmont Avenue; potential loss, injury or death resulting from the rupture of a known earthquake fault or strong seismic ground shaking; impacts to noise levels in the project vicinity; significant intersection delays in certain areas; and, if new or altered wastewater collection facilities were required to accommodate the projects, potential periodic construction-related impacts to traffic, noise, storm water, cultural resources and air.

The EIR was presented to the Regents' Committee on Grounds and Buildings for consideration on November 14, 2006. On this date, the Regents, sitting as a whole, heard public comments on all of the Integrated Projects, including the Athlete Center project. The committee thereafter adopted a recommendation that the Regents approve the $111,948,000 budget for the Athlete Center, but deferred consideration of the EIR and final approval of the Athlete Center for several weeks. On November 16, 2006, the Regents adopted the committee's recommendation.

Finally, on December 5, 2006, following another public hearing, the committee certified the EIR and gave final approval to the Athlete Center project. In doing so, the committee adopted findings and a statement of overriding considerations. According to this statement, the Regents, in approving the Integrated Projects, balanced the projects' economic, social, technological and other benefits against their unavoidable environmental risks, and determined that those benefits outweighed the significant adverse environmental effects not mitigated to less than significant levels by the measures set forth in the EIR.

III. *Trial Court Proceedings.*

In December 2006, various appellants filed separate lawsuits, which were later consolidated, challenging the Regents' certification of the EIR and

approval of the Athlete Center project. The lawsuits raised claims under both CEQA and the Alquist-Priolo Act.[6]

On February 9, 2007, the trial court issued a preliminary injunction prohibiting the University from beginning construction on the Athlete Center project to the extent it would change or alter the environment, while permitting further seismic and geophysical testing at the construction site.

In September and October 2007, the trial court conducted a trial on the merits. Following trial, on December 10, 2007, the trial court ordered the parties to submit expert declarations relating to the claims arising under the Alquist-Priolo Act after concluding such evidence was necessary to help the court interpret technical design drawings in the administrative record relevant to those claims. The parties complied with this order and, on March 20, 2008, the trial court heard argument from the parties regarding these expert declarations, including the propriety of considering them. Following this hearing, the trial court took the matter under submission.

On June 18, 2008, the trial court issued a 129-page decision granting the petitions in part and denying them in part. Specifically, the trial court denied appellants' CEQA claims with one exception: it rejected the Regents' finding and conclusion in the EIR that doubling the number of capacity events at the Stadium as part of phases II and III of the Stadium project would cause unavoidable significant environmental effects. The trial court denied appellants' Alquist-Priolo Act claims with the following exception: it found that three aspects of the Athlete Center project constituted alterations to the Stadium within the meaning of the act, requiring the Regents to determine the value of those alterations to ensure they did not exceed 50 percent of the Stadium's value: (1) installation of a grade beam along the base of the Stadium's west wall; (2) alterations to two Stadium staircases; and (3) penetration of the Stadium's ground floor slab to facilitate installation of the Athlete Center's telecommunications system.

On July 22, 2008, the trial court issued a peremptory writ of mandate ordering the Regents to (1) suspend approval of phases II and III of the Stadium project until either the proposal to increase the number of capacity events at the Stadium was withdrawn or substantial evidence was presented to support the Regents' finding and conclusion that doubling the number of capacity events would cause unavoidable significant environmental impacts; and (2) suspend approval of the Athlete Center until the Regents' could demonstrate that the cost of constructing the identified alterations to the Stadium would be less than 50 percent of the Stadium's value.

---

[6] The City of Berkeley also filed a lawsuit in December 2006, raising similar claims, but has not joined in this appeal.

The trial court thereafter deemed the Regents' response to its June 18, 2008 order, which was submitted on June 27, 2008, to be a return to the writ of mandate. In this response, the Regents advised the trial court that they had removed from the Stadium project the proposal for the additional capacity events and from the Athlete Center project all the proposed alterations to the Stadium identified by the court, thereby putting the Regents in compliance with the order. Based on this response, the trial court dissolved the preliminary injunction, permitting construction of the Athlete Center to begin.

An amended judgment was entered for the Regents on August 26, 2008. This appeal followed.[7]

## DISCUSSION

On appeal, appellants present two principal issues for our consideration.

■ First, appellants contend the Regents violated the Alquist-Priolo Act by approving the Athlete Center project, which is phase I of the Stadium project. With certain exceptions, the Alquist-Priolo Act prohibits the construction of structures for human occupancy across the trace of an active fault or within 50 feet of an active fault, and prohibits the construction of an addition or alteration to a structure already existing on the trace of an active fault if the value of the addition or alteration exceeds 50 percent of the value of the structure. (§§ 2621.5, 2621.7 subd. (c); Guidelines, § 3603, subd. (a).)

■ Second, appellants contend the Regents violated CEQA by certifying a defective EIR for the Integrated Projects and by approving the Athlete Center project. CEQA, among other things, requires a public agency to prepare and certify an EIR for qualifying projects to identify the proposed project's significant environmental effects, to identify possible alternatives to the project, and to indicate ways in which the project's significant environmental effects can be mitigated or avoided. (§ 21002.1, subd. (a).)

We address each of appellants' contentions in turn below.

---

[7] The trial court initially issued a judgment on July 22, 2008, at the same time it issued the peremptory writ of mandate. Appellants filed a notice of appeal on July 24, 2008. This court dismissed the appeal on August 7, 2008, deciding it was premature because the Regents had not yet filed a final return to the peremptory writ of mandate and because appellants had recently filed a motion for new trial and to vacate judgment. After resolving these issues, the trial court issued the amended judgment on August 26, 2008, substantially identical to the original judgment. Appellants then filed the operative notice of appeal, as well as a supersedeas petition and request for stay, which this court denied on September 4, 2008. Appellants' subsequent petition for review and request for stay was denied by the California Supreme Court on September 8, 2008.

## I. The Alquist-Priolo Act.

### A. Standard of Review.

Appellants' challenge in these proceedings is one of mandamus, which is available to correct a public agency's abuse of discretion and to compel the agency's performance of a clear, present, and ministerial duty where a petitioner has a beneficial right to performance of that duty. (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 540 [28 Cal.Rptr.2d 617, 869 P.2d 1142]; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1265 [4 Cal.Rptr.3d 536] (*Carrancho*); see also Code Civ. Proc., § 1085.) " 'In determining whether an abuse of discretion has occurred, a court may not substitute its judgment for that of the administrative board [citation], and if reasonable minds may disagree as to the wisdom of the board's action, its determination must be upheld [citation].' (*Manjares v. Newton* (1966) 64 Cal.2d 365, 370–371 [49 Cal.Rptr. 805, 411 P.2d 901].)" (*Better Alternatives for Neighborhoods v. Heyman* (1989) 212 Cal.App.3d 663, 672 [260 Cal.Rptr. 758] (*Better Alternatives*).) " 'In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . .' [Citation.]" (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547 [75 Cal.Rptr.3d 574].)

Where a petitioner's challenge in a mandamus action rests on the sufficiency of the evidence, "the court does not have the power to judge the intrinsic value of the evidence or to weigh it." (*Better Alternatives, supra,* 212 Cal.App.3d at p. 672; see also *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 585–586 [86 Cal.Rptr.3d 1] (*O.W.L. Foundation*).) Further, " '[b]ecause "trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo." ' " (*O.W.L. Foundation, supra,* 168 Cal.App.4th at p. 586.)

### B. Compliance with the Alquist-Priolo Act.

The Alquist-Priolo Act was enacted to prohibit the location of structures for human occupancy across the trace of active faults. (§ 2621.5; Guidelines, § 3603, subd. (a).) In furtherance of this mandate, the act's implementing regulations provide that "No structure for human occupancy . . . shall be permitted to be placed across the trace of an active fault. Furthermore, as the area within fifty (50) feet of such active faults shall be presumed to be underlain by active branches of that fault unless proven otherwise by an

appropriate geologic investigation and report . . . no such structures shall be permitted in this area."[8] (Guidelines, § 3603, subd. (a).)

The Alquist-Priolo Act applies broadly to "any project . . . which is located within a delineated earthquake fault zone, upon issuance of the official earthquake fault zone maps to affected local jurisdictions, except as provided in Section 2621.7."[9] (§ 2621.5, subd. (b).) "[P]roject" is defined to include "[s]tructures for human occupancy." (§ 2621.6, subd. (a)(2).)

The Alquist-Priolo Act recognizes a limited number of exceptions to the general prohibition on locating structures for human occupancy across the trace of active faults. Relevant here, the prohibition does not apply to "[a]ny development or structure in existence prior to May 4, 1975, except for an alteration or addition to a structure that exceeds the value limit specified in subdivision (c)." (§ 2621.7, subd. (b).) Section 2621.7, subdivision (c), in turn, provides that the value of any such alteration or addition must not exceed 50 percent of the total value of the structure. (§ 2621.7, subd. (c).)

Undisputedly, both the Stadium and the Athlete Center are located within an earthquake fault zone, and thus are subject to the Alquist-Priolo Act. Accordingly, as the trial court noted, the Alquist-Priolo Act restricts the University's ability to proceed with the Stadium project in three ways: (1) the University may not build a structure for human occupancy across the trace of an active fault; (2) the University may not build within 50 feet of an active fault unless it first demonstrates the proposed structure will not be built over an active branch of a fault; and (3) the University may not construct an addition or alteration to a structure built on the trace of an active fault before May 4, 1975, if the cost of the addition or alteration exceeds 50 percent of the structure's value.

According to appellants, the Regents have failed to comply with these restrictions. Specifically, they contend the Regents' approval of phase I of the Stadium project, construction of the Athlete Center, violated Alquist-Priolo in the following ways: (1) the Regents failed to determine whether the Athlete Center is an "addition" or "alteration" to the Stadium for purposes of the act (§ 2621.7, subd. (c)); (2) they failed to determine whether the cost of constructing the Athlete Center exceeds 50 percent of the value of the Stadium (*ibid.*); and (3) they deliberately separated the Stadium project into three phases to avoid the act's prohibition on making an addition or alteration

---

[8] A fault is "active" if it "has had surface displacement within Holocene time (about the last 11,000 years) . . . ." A fault trace is a line formed by the intersection of a fault and the earth's surface. (Guidelines, § 3601, subds. (a), (b).)

[9] The State Geologist is required to delineate active earthquake fault zones, which are then identified on official earthquake fault zone maps. (§§ 2621.5, subd. (b), 2622.)

to a structure located across the trace of an active fault if the cost of the addition or alteration exceeds 50 percent of the structure's value (*ibid.*). We address each of these contentions in turn.[10]

### 1. *Alterations and Additions Under the Alquist-Priolo Act.*

The proposed Athlete Center is a 158,000-square-foot building costing approximately $112 million. In designing the building, the University sought to "respect the architecture and character of the existing Stadium by retaining the historic west façade and bowl shape." Thus, to minimize its physical mass, the Athlete Center is designed to be constructed below grade to the west of and adjacent to the Stadium.

The design calls for the Athlete Center's roof to function as a large exterior plaza at the existing parking lot level that will connect the Stadium's north entrance to current and future stairway entrances to the west and south seating areas of the Stadium. This plaza will be used for daily social gatherings, as well as for crowd circulation during Stadium events and for emergency vehicle access. Below the plaza, set into the hillside, will be a two-story building housing weight and training rooms for athletes, sports medicine facilities, locker rooms, coaches' and staff offices and meeting rooms for 14 varsity sports. In addition, administrative offices and meeting facilities currently housed in the Stadium will move to the new building immediately upon its completion to allow the University to begin retrofitting and renovating the Stadium as part of phases II and III of the Stadium project.

Below, the trial court observed there was no evidence the University considered during the design process whether the proposed Athlete Center would be an alteration or addition to the Stadium. The Regents explained that, because the Athlete Center was designed to be a structure wholly independent from the Stadium, the University properly assumed the Athlete Center would comply with the Alquist-Priolo Act so long as it was not built over the trace of an active fault or within 50 feet of an active fault absent proof that it was not built over an active branch of a fault. (§ 2621.7,

---

[10] As we will discuss in more detail in part II., below, appellants have not appealed the trial court's finding that substantial evidence supports the Regents' determination that the Athlete Center will not be built across the trace of an active fault. Nor have appellants appealed the trial court's finding that the initial Athlete Center design included three limited alterations to the Stadium. As set forth above, in response to this finding, the Regents revised the project design to omit the limited alterations identified by the trial court. Accordingly, we need not address these issues further for purposes of this appeal.

subd. (c).) To this end, the University hired seismic experts to conduct a detailed study of the proposed Athlete Center site to confirm it was not astride any active faults.[11]

At oral argument, appellants, for the first time, asked that we remand this matter to the trial court to order the Regents to perform their "legal duty" to (1) make a threshold determination as to whether the Athlete Center is an alteration or addition to the Stadium and, then, (2) make determinations as to both the value of the Stadium and the costs of any proposed additions or alterations to the Stadium to confirm compliance with the Alquist-Priolo Act's 50 percent value restriction.

▮ Yet when asked by this court to do so, appellants could point to nothing in the Alquist-Priolo Act imposing a legal duty on an agency to make these determinations, particularly where, as here, the University designed the Athlete Center to be an independent structure and confirmed it would not be situated across the trace of an active fault. As the Regents point out, the Alquist-Priolo Act restricts or prohibits the construction or improvement of certain structures in earthquake fault zones; it does not dictate particular procedures the agency must follow when approving a project. In particular, the act does not require the agency to determine, in the first instance, whether a proposed structure qualifies as an addition or alteration, or to calculate its cost to ensure compliance with the act's value restriction. (See § 2621.7.) We therefore reject appellants' belated request for remand, given that it is untimely and without legal support.

However, putting aside the Regents' alleged failure, as a procedural matter, to make certain determinations prior to project approval, we nonetheless must determine whether, as a substantive matter, the Regents violated the Alquist-Priolo Act by failing to adhere to the act's restriction on the value of additions and alterations to a preexisting structure for human occupancy situated across the trace of an active fault. This inquiry, as the trial court noted, hinges on the statutory definition of three words: "addition," "alteration," and "structure." (§ 2621.7, subd. (b).) Because neither the Alquist-Priolo Act nor its implementing regulations define these terms, we must turn to the rules of statutory interpretation for guidance.

a. *Defining "Alteration" and "Addition."*

▮ The primary goal in interpreting any statute is to " 'determine the Legislature's intent so as to effectuate the law's purpose.' " (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582 [48

---

[11] This peer-reviewed study is discussed in great detail below. (See pp. 263–266, *post.*)

Cal.Rptr.3d 340].) To this end, we "give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose, i.e., the object to be achieved and the evil to be prevented by the legislation." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873].) If the statutory language is clear, we follow its plain meaning so long as an absurd or unintended consequence does not result. (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19 [56 Cal.Rptr.2d 706, 923 P.2d 1].) However, "when a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute." (*Ibid.*)

Here, appellants claim the trial court's finding that the Athlete Center is not an "addition" or "alteration" within the meaning of the Alquist-Priolo Act is belied by the terms' ordinary dictionary definitions. "Addition" is commonly defined as "the action or process of adding something to something else," and "alteration" as "the action or process of altering or being altered." (New Oxford American Dict. (2d ed. 2005) pp. 18, 46.) "Alter," in turn, is commonly defined as to "change or cause to change in character or composition, typically in a comparatively small but significant way." (*Id.* at p. 46.)

Consistent with the ordinary meaning of "addition," appellants note that the Athlete Center project includes a new roof plaza that will "dramatically change the character and composition of the Stadium's west side and be directly connected to the existing Stadium." This new plaza "extends or increases the floor area of the Stadium from inside the western entrances, providing a new one and one-half acre terrace designed as part of the Stadium's operating area." According to appellants, a "reasonable person applying a common definition of addition would find that the Athlete Center, like a deck or terrace to one's house, is an addition to the existing Stadium." With respect to the term "alteration," appellants add that the Athlete Center is designed to change the day-to-day operations of the Stadium, given that administrative offices and meeting facilities currently housed in the Stadium are to move to the Athlete Center. Further, the new plaza of the Athlete Center will "drastically increase use of the west entrances to the Stadium." According to appellants, "[the] change in the Stadium's function is plainly an 'alteration' as that term is commonly defined."

In disputing that the proposed Athlete Center meets the statutory definition of "alteration" or "addition," the University directed the trial court to the California Building Code (CBC).[12] As already mentioned, the University explained the Athlete Center was designed as an independent structure for human occupancy pursuant to the relevant provisions of the CBC, and thus is not subject to the Alquist-Priolo Act's value restrictions.

---

[12] The CBC is also known as title 24, part 2 of the California Code of Regulations.

Following the University's lead, the trial court relied on the CBC, as well as the Uniform Building Code (UBC), to define "alteration" and "addition" for purposes of the Alquist-Priolo Act. The trial court based its decision on the principle that, "when [a] word has both a specific legal meaning and a more general sense in informal legal usage or in lay speech . . . lawmakers are presumed to have used the word in its specifically legal sense." (*Arnett v. Dal Cielo, supra*, 14 Cal.4th at pp. 19–20.)

While declining at oral argument to label the trial court's reliance on the CBC and UBC "unreasonable," appellants reiterated the point made in their opening brief that "alteration" and "addition" should be assigned their plain and commonsense dictionary definitions, and that it is "unnecessary" to consider other authority. Appellants then argue alternatively that, even under the CBC and UBC definitions, where, as here, there are certain "functional linkages" between the preexisting structure and the new structure, the new structure may qualify as an alteration of and addition to the preexisting structure.

As an initial matter, we reject appellants' rather halfhearted challenge to the relevance of the building codes in interpreting the Alquist-Priolo Act. Appellants are undoubtedly correct that the CBC did not exist when Alquist-Priolo was enacted. However, the Regents are likewise correct that, in the absence of express statutory language, the terms "alteration," "addition" and "structure" should be defined with reference to the particular context in which they are used—to wit, building construction and improvement of structures for human occupancy in delineated earthquake fault zones. This is consistent with the general principle that, when interpreting any statute, a court must identify the Legislature's apparent intent in light of what is both reasonable and consistent with the statute's general purpose. (*In re Corrine W.* (2009) 45 Cal.4th 522, 529 [87 Cal.Rptr.3d 691, 198 P.3d 1102] [if " 'the text alone does not establish the Legislature's intent clearly, we must turn to other sources for insight, including the provision's statutory context, its legislative history, and "the human problems the Legislature sought to address" in adopting the [statutory] scheme' "]; *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462] [" 'the Legislature intends reasonable results consistent with its apparent purpose' "].)

Relevant here, the Alquist-Priolo Act is intended "to provide the citizens of the state with increased safety and to minimize the loss of life during and immediately following earthquakes by facilitating seismic retrofitting to strengthen buildings, including historical buildings, against ground shaking." (§ 2621.5, subd. (a).) The building codes, in turn, govern the seismic strengthening of buildings. For example, the CBC provides that "[e]very

structure and portion thereof, including nonstructural components that are permanently attached to structures and their supports and attachments, shall be designed and constructed to resist the effects of earthquake motions." (Cal. Code Regs., tit. 24, § 1613.1, subd. (a); see also UBC, § 2312 (1976 ed.); UBC, § 2314, subd. (a) (1970 ed.).) Under these circumstances, we believe the trial court had a reasonable basis for relying on the CBC and UBC to interpret technical terms relating to both building construction and seismic safety that are set forth, without definition, in the statutory language. (*Arnett v. Dal Cielo, supra*, 14 Cal.4th at pp. 19–20.)

■ Turning then to the building codes, the 1970 version of the UBC, in effect when Alquist-Priolo was enacted, defines "structure" as "that which is built or constructed, an edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner." The 1970 UBC does not define "addition" or "alteration," but the 1976 version does. The 1976 UBC retains the definition of "structure" set forth in the 1970 UBC, defines "addition" as "an extension or increase in floor area or height of a building or structure," and defines "alteration" as "any change, addition or modification in construction or occupancy."

Nearly identical to the 1976 UBC, the current CBC defines "structure" as "[t]hat which is built or constructed," "alteration" as "any change, addition or modification in construction or occupancy or structural repair or change in primary function to an existing structure" (other than repair or addition), and "addition" as an "extension or increase in floor area or height of a building or structure." (Cal. Code Regs., tit. 24, § 202.) "Floor area," in turn, is defined as "the area within the inside perimeter of the exterior walls of the building" or, if surrounding exterior walls do not exist, "the usable area under the horizontal projection of the roof or floor above." (Cal. Code Regs., tit. 24, § 1002.1.)

Thus, with guidance from these building code definitions, we now turn to the issue at hand—to wit, whether, based on the facts of this case, the trial court abused its discretion in finding that the Athlete Center is *not* an alteration or addition to the Stadium within the meaning of the Alquist-Priolo Act.[13] (*Better Alternatives, supra*, 212 Cal.App.3d at pp. 671–672; *American Board of Cosmetic Surgery v. Medical Board of California, supra*, 162 Cal.App.4th at pp. 547–548.)

---

[13] We simply note that, as appellants appeared to concede at oral argument, the definitions of "alteration" and "addition" set forth in the CBC and UBC are not materially different from those set forth in the common dictionary.

### b. *The Evidence Relating to "Alteration" and "Addition."*

#### i. *Extra-record Evidence.*

Before turning to the record, there is one related legal issue that must be resolved. Below, the trial court decided it could not apply the statutory definitions of "alteration" and "addition" to the Athlete Center without the assistance of expert testimony to explain certain technical aspects of the building's design and construction. The trial court pointed out both parties acknowledged how difficult it is for lay people to understand the complex architecture and structural engineering documents in the record. As the trial court explained, even "[a]ssuming the University could rely on structural design provisions of the CBC to design [an Athlete Center] that . . . satisfies Alquist-Priolo because '[the Athlete Center] and [Stadium] will not involve structurally independent elements' . . . , the court must determine whether the evidence in the record demonstrates such a structure."

Accordingly, on December 10, 2007, the trial court ordered the parties to submit expert evidence in the form of written declarations addressing whether the Athlete Center was designed as an addition or alteration to the Stadium within the meaning of the Alquist-Priolo Act. In doing so, the court emphasized that "[s]uch evidence should address the design features of the [Athlete Center] as depicted in the design documents in the record, including whether that evidence is sufficient to demonstrate that the [Athlete Center] will be structurally independent from the [Stadium] by reference to the various cited provisions of the CBC, and the significance of this structural independence."

Although complying with this order below, appellants challenge it on appeal, arguing the trial court lacked authority to consider evidence outside the administrative record. Appellants insist that, in mandamus proceedings challenging quasi-legislative administrative decisions, the trial court is "strictly limited to the administrative record." (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 574 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*) ["extra-record evidence is generally not admissible in non-CEQA traditional mandamus actions challenging quasi-legislative administrative decisions"]; see also *San Joaquin County Local Agency Formation Com. v. Superior Court* (2008) 162 Cal.App.4th 159, 167 [76 Cal.Rptr.3d 93].)

The Regents counter that the trial court had discretion to accept declarations from expert architects and engineers to help " 'translat[e]' " technical design drawings in the administrative record. The Regents also insist the court did not rely on the expert declarations to " 'challenge' " the University's actions, but rather to "understand" them, thereby rendering inapposite cases cited by

appellants for the proposition that extra-record evidence is inadmissible to challenge quasi-legislative administrative decisions.

We agree with the Regents that *Western States* and its progeny do not preclude consideration of extra-record evidence in this case, but for reasons other than those provided. First, both parties treat appellants' Alquist-Priolo challenge as a traditional mandamus action rather than as an administrative mandamus action. We agree with this treatment given the absence of any legally mandated administrative hearing with respect to the University's compliance with the Alquist-Priolo Act. (See *Better Alternatives, supra*, 212 Cal.App.3d at p. 671, fn. 6 [concluding that traditional mandamus under Code Civ. Proc., § 1085 is the appropriate proceeding for the appellants' *Alquist-Priolo* challenge based on the lack of a statutorily required hearing]; cf. Code Civ. Proc., § 1094.5 [permitting a party seeking review of an administrative decision to bring an administrative mandamus action if such decision was "made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in [a public agency]"].)

Further, while the California Supreme Court in *Western States* indeed held that "extra-record evidence is generally not admissible in [non-CEQA] traditional mandamus actions challenging quasi-legislative administrative decisions . . . ," the court thereafter took pains to confirm that it would "continue to allow admission of extra-record evidence in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Western States, supra*, 9 Cal.4th at p. 576; see also *Carrancho, supra*, 111 Cal.App.4th at p. 1269.)[14] Administrative actions that do not involve public hearings, such as those taken pursuant to the Alquist-Priolo Act (and unlike those taken pursuant to CEQA), are generally considered " 'informal.' " (*Carrancho, supra*, 111 Cal.App.4th at p. 1269; see also *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 521 [80 Cal.Rptr.3d 28, 187 P.3d 888].) Thus, because the record upon which a public agency's informal action is based is often inadequate to permit meaningful review, the court presiding over traditional mandamus proceedings challenging the agency's informal action is generally permitted to consider extra-record evidence if the facts are in dispute. (*Carrancho*, at p. 1269, quoting 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar

---

[14] According to the *Carrancho* court: "The [*Western States*] court was persuaded by commentators who pointed out that 'the administrative record developed during the quasi-legislative process is usually adequate to allow the courts to review the decision without recourse to such evidence,' and that 'extra-record evidence is usually necessary only when the courts are asked to review ministerial or informal administrative actions, because there is often little or no administrative record in such cases.' ([*Western States, supra*, 9 Cal.4th] at p. 575.)" (*Carrancho, supra*, 111 Cal.App.4th at p. 1269.)

2003) Judicial Review, § 23.52, pp. 969–970 [" 'When a CCP § 1085 ordinary mandamus proceeding is brought to challenge an administrative decision made without a hearing, if the facts are in dispute, a reviewing court is not limited to the record of the agency's proceedings. In the absence of a hearing, the record documenting the agency's action will not provide an adequate basis for judicial review. In such a case a reviewing court may hear extra-record evidence' "].) Moreover, the general standard of review for discovery rulings—the abuse of discretion standard—applies in such actions. (*San Joaquin County Local Agency Formation Com. v. Superior Court, supra*, 162 Cal.App.4th 159, 172.)

Applying these principles here, we conclude that, given the conflicting evidence regarding the Athlete Center's design and its relationship to the Stadium, the trial court did not abuse its discretion in considering extra-record evidence in the form of expert declarations from engineers and architects when deciding whether the Regents complied with the Alquist-Priolo Act. (See *San Joaquin County Local Agency Formation Com. v. Superior Court, supra*, 162 Cal.App.4th at p. 172.) Moreover, to the extent appellants claim the trial court abused its discretion in accepting the opinions of those experts who opined the Athlete Center is *not* an alteration or addition to the Stadium, their contention raises a distinct issue to which we now turn. (See *Better Alternatives, supra*, 212 Cal.App.3d at pp. 671–672.)

### ii. *The Expert Declarations.*

The Regents offered declarations from several experts opining that the Athlete Center is not an addition or alteration to the Stadium under the Alquist-Priolo Act. These experts, who include a variety of experienced engineers and architects, generally focused on the degree to which the Athlete Center was designed to be a separate or "independent" building from the Stadium, both structurally and functionally.

Specifically, several of the Regents' experts noted the Athlete Center will not add floor area or height to the Stadium and, thus, will not meet the CBC's definition of an addition. (Cal. Code Regs., tit. 24, §§ 202, 1002.1.) The Athlete Center's lead architect, for example, pointed to design drawings indicating the Athlete Center was designed to have a floor area of 144,000 square feet, an amount not inclusive of the Stadium's floor area. He further noted that, with respect to function, the Stadium will contribute to the Athlete Center's functioning on a day-to-day basis "only by virtue of the availability of its practice field, which will be in close proximity to the [Athlete Center]." Further, while the Athlete Center's locker rooms and training rooms will contribute to the Stadium's functioning on game days, "the buildings themselves are separate structures with separate uses." Finally, an engineering

adviser for the project added that the Athlete Center will share no structural elements with the Stadium (including no shared beams, footings, wall elements or columns), and thus will not share the Stadium's risk of earthquake fault rupture.

Several of the Regents' experts also opined that the Athlete Center will not change or modify the structure, floor area, dimensions or primary function of the Stadium and, thus, will not be an alteration to the Stadium under the CBC definition. (Cal. Code Regs., tit. 24, § 202.) Further, with respect to function, they noted the Athlete Center was designed to house multiple occupancies, including office space and assembly, unlike the Stadium, which was designed as an open-air facility for large gatherings.

Finally, several of the Regents' experts noted that, for purposes of complying with the building and fire codes, the Athlete Center will be distinct from the Stadium with respect to construction type, emergency egress, fire separation, electrical and water services, and occupancy type.[15] For example, with respect to construction type, the Athlete Center will be classified as a Type II One-Hour building and the Stadium is a Type I Fire Resistive building. (Cal. Code Regs., tit. 24, §§ 504.2, 505.1.2.) With respect to occupancy type, the Athlete Center will have a primary classification of A-3 Assembly while the Stadium has an A-4 Stadium classification. (Cal. Code Regs., tit. 24, § 2901.2.) The two buildings will also have separate water and electrical service and egress in case of emergency.

Appellants' experts, not surprisingly, disagreed with many of these opinions. In particular, these experts, who also include experienced architects and engineers, opined that, even if the Athlete Center is designed to have independent "structural systems" (i.e., systems that are "self sufficient and do not transfer loads to, or receive loads from" other systems), the building will nonetheless be an addition or alteration to the Stadium because it will serve as a "supplement and accessory to the Stadium" and will have an "extremely close [physical] juxtaposition." These experts further noted the Athlete Center will be partially structurally dependent on the Stadium, as evidenced by the pedestrian route that crosses the Athlete Center plaza and approaches the "seismically vulnerable west wall of the [Stadium]." Further, the buildings will share a functional dependency due to the Athlete Center's tendency to increase the Stadium's rate of use and occupancy.

As this record reflects, both parties offered detailed evidentiary showings in support of their respective positions regarding the proper classification of the

---

[15] These expert opinions are consistent with statements by the University in the record that the Athlete Center would be a "stand-alone structure" and a "separate building under all building and fire code definitions."

Athlete Center. The trial court, after thoroughly considering these showings, accepted the opinions of the Regents' experts (albeit with certain exceptions not relevant here). In particular, the trial court found these expert declarations adequately supported the Regents' position that the Athlete Center will not be an addition or alteration to the Stadium for purposes of the Alquist-Priolo Act because, among other things, it is designed to be both structurally and functionally independent, will add no floor area or height, will contribute to the functioning of the Stadium in only very limited ways, and will be subject to different fire and building code requirements.

While other evidence in the record undoubtedly suggests the Athlete Center and the Stadium will be connected, at least on some level, given the buildings' close proximity and general athletic purpose, we conclude such evidence does not warrant reversal of the trial court's and the Regents' judgment that the buildings will be distinct for purposes of Alquist-Priolo.[16] In a traditional mandamus action such as this, it is not our role to judge the extrinsic value of the evidence, or to reweigh it, in order to reach our own judgment. It is simply to ensure the judgment that has already been reached below is not arbitrary, capricious, or entirely lacking in evidentiary support. Having done so, our inquiry is complete.[17] (*Better Alternatives, supra*, 212 Cal.App.3d at p. 672 ["Even were we to agree with [appellants' experts], we have no power to substitute our judgment for that of the Regents of the University."]; *American Board of Cosmetic Surgery v. Medical Board of California, supra*, 162 Cal.App.4th at pp. 547–548 [no grounds for reversal exist where the agency has " ' " 'adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute' " ' "].)

Finally, given our conclusion that the trial court did not abuse its discretion in finding that the Athlete Center is not an addition or alteration to the Stadium for purposes of the Alquist-Priolo Act, we likewise decline to disturb its related finding that the Regents had no obligation under the act to

---

[16] The parties, in their briefs, debate whether "structural independence" is alone sufficient to preclude a building from qualifying as an "alteration" or "addition" under the Alquist-Priolo Act. We do not believe it is necessary to resolve this issue for purposes of this appeal, given the evidence in the record relating to other factors—including building code classifications and functional independence—that support the decision that the Athlete Center is not an addition or alteration to the Stadium. (See *Better Alternatives, supra*, 212 Cal.App.3d at pp. 672–673.)

[17] Moreover, because our role is not to reweigh evidence (*Better Alternatives, supra*, 212 Cal.App.3d at pp. 671–672), the trial court's decision must be affirmed despite the existence in the record of contrary evidence, including language in the DEIR referring to the Athlete Center as an "addition." For example, the DEIR states that the "effect of the [Athlete Center] design would be for the *addition* to act as a base to the [Stadium], which partially blocks the view to the building above it." (Italics added.)

calculate the total cost of the Athlete Center project to ensure it does not exceed 50 percent of the Stadium's value.[18] (§ 2621.7, subd. (c).)

### 2. The Stadium Project's Compliance with Alquist-Priolo's Value Restriction.

We now consider appellants' related contention that the Regents violated Alquist-Priolo by separating the Stadium project into three separate phases in order to ensure compliance with the act's restriction on the value of alterations or additions to structures built on active faults. According to appellants, to comply with this restriction, the University was required to calculate the cost of the entire Stadium project, including the seismic retrofitting and renovations to the Stadium planned for phases II and III.

As mentioned above, the trial court initially found that phase I of the Stadium project, construction of the Athlete Center, included three limited alterations to the Stadium. Accordingly, the trial court ordered the Regents to comply with section 2621.7, subdivision (c), by calculating the cost of those three alterations to ensure none exceeded 50 percent of the Stadium's value before giving final approval to the Athlete Center. However, the trial court also found that the Regents were not required to calculate the cost of phases II and III of the Stadium project before approving the Athlete Center, because those phases did not involve the Athlete Center and had not yet been presented to the Regents for approval. In doing so, the trial court noted: "Petitioners are free to challenge any subsequent approval by the University on the basis of non-compliance with Alquist-Priolo."

We agree with the trial court in this regard. As set forth above, the Alquist-Priolo Act restricts the value of additions and alterations made to structures for human occupancy located across the trace of active faults. (§ 2621.7, subd. (c).) The Athlete Center is not a structure located across the trace of an active fault; rather it is an independent building adjacent to such a structure (to wit, the Stadium). As we have already held, this does not render the Athlete Center an addition or alteration to the Stadium. Moreover, to the extent any additions or alterations will be made to the Stadium during phases

---

[18] We acknowledge the Regents' additional argument, set forth in their responding brief and reiterated at oral argument, that the Alquist-Priolo Act does not apply to them because it applies only to cities and counties. However, whether the Alquist-Priolo Act applies to the Regents is purely an academic question for purposes of this appeal, given our conclusion that the Athlete Center is not subject to the act's value restriction because it does not qualify as an alteration or addition under the act.

II and III of the project, the Regents have not yet approved them. As such, as the trial court noted, any challenge with respect to phases II and III are at this point premature.[19]

## II. *CEQA.*

■ When enacting CEQA, the Legislature made clear its intention that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects."[20] (§ 21002.) Accordingly, public agencies are required by CEQA to prepare an EIR that, among other things, provides the public with "detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061; see Guidelines, § 15003, subds. (b)–(e).) Where project alternatives or mitigation measures are not feasible, the EIR must set forth that there are overriding considerations that render the unmitigated effects outweighed by the project's benefits. (Guidelines, § 15093.) In this way, the public is adequately informed of the agency's reasoning in deciding that an environmentally significant action should either be approved or rejected, and can thus hold the agency accountable for its decision. (*Laurel Heights I, supra*, 47 Cal.3d at p. 392.)

■ To ensure these public policies are respected, the Legislature has designed an extensive procedural framework, which the California Supreme Court has succinctly described as follows. "Under CEQA, the public is notified that a draft EIR is being prepared (§§ 21092 and 21092.1), and the draft EIR is evaluated in light of comments received. (Guidelines, §§ 15087

---

[19] We note for the record that the Alquist-Priolo Act does not prescribe any particular method for valuing a structure located astride an active fault for purposes of applying the act's restriction on the value of an addition or alteration made to the structure. As the trial court noted, however, the act is clear that its purpose is to promote seismic safety. Valuing an existing structure based solely on its replacement cost would result in few actual restrictions on constructing an addition or alteration to the structure, given that few alterations or additions would be valued at more than 50 percent of the value of replacing the structure. To the contrary, other valuation methods more reflective of the current value of the existing structure, including the structure's wear and tear, would appear to better serve the act's intended purpose of promoting seismic safety, given the greater likelihood that the value of an alteration or addition would exceed 50 percent of the value of the structure. The trial court declined to prescribe any particular method given the absence of a complete record on this issue. We affirm this decision. Until this novel and complex issue is truly ripe for review, it would be imprudent for us to consider it.

[20] CEQA defines "[f]easible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.)

and 15088.) The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. (Guidelines, §§ 15090 and 15132, subds. (b)–(d).) [Fn. omitted.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. (Guidelines, § 15090.) Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits. (§§ 21002, 21002.1, and 21081; Guidelines, §§ 15091–15093.)" (*Laurel Heights I, supra*, 47 Cal.3d 376, 391.)

Here, appellants claim the Regents violated CEQA by certifying a legally inadequate EIR for the Integrated Projects and by approving one of those projects, the Athlete Center. In doing so, appellants allege that the following sections of the EIR were defective: (1) the description of baseline environmental conditions; (2) the project description; (3) the statement of objectives; (4) the discussion of project alternatives; (5) the discussion of impacts to biological resources; and (6) the discussion of impacts and adoption of mitigation measures with respect to archaeological resources.

In addition, appellants contend the Regents failed to follow procedures required under CEQA by (1) delegating authority to certify the EIR to the agency's Committee on Grounds and Buildings; (2) giving approval to the Athlete Center project before certifying the EIR; (3) failing to recirculate the DEIR; (4) making findings without adequate evidentiary support; and (5) making a statement of overriding considerations that lacked adequate evidentiary support. We address each of appellants' CEQA contentions below.

A. *Standard of Review.*

" 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 563–564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta*).)

" '[A] court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." ' " (*In re Bay-Delta etc., supra*, 43 Cal.4th 1143, 1161–1162, quoting *Laurel Heights I, supra*, 47 Cal.3d at p. 392, quoting § 21168.5.) Substantial evidence means "enough relevant information

and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence does not include "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment . . . ." (*Ibid.*)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area, supra*, 40 Cal.4th 412, 427.) Further, " 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' " (*Laurel Heights I, supra*, 47 Cal.3d at p. 393.)

B. *The Adequacy of the EIR.*

The EIR has been deemed the "heart of CEQA," and thus is the obvious starting point for our analysis. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1162.) "The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' (*Goleta, supra*, 52 Cal.3d at p. 564.)" (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1162.)

"In determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project. (Cal. Code Regs., tit. 14, § 15151.) The CEQA Guidelines further provide that 'the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Cal. Code Regs., tit. 14, § 15151.)" (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1175.) The overriding issue on review is thus "whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public [to] discern from the [EIR] the 'analytic route the . . . agency traveled from evidence to action.' (*Topanga Assn. for a Scenic Community [v. County of Los Angeles* (1974) 11 Cal.3d 506,] 515 [113 Cal.Rptr. 836, 522 P.2d 12].)" *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 749 [22 Cal.Rptr.2d 618] (*Al Larson*).)

Ultimately, " '[w]e may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at pp. 1161–1162.)

### 1. *The Description of Baseline Geological Conditions.*

In the first of three arguments directed towards the seismic safety of the Integrated Projects, appellants claim the DEIR lacked an adequate description of baseline geological conditions at the project sites. Specifically, appellants point to a statement in the DEIR that "a geological investigation and report [of the proposed Athlete Center site] are being prepared . . . ." According to appellants, the DEIR's description of geological conditions was deficient because, at the time the DEIR was publicly reviewed, it did not contain information relating to this investigation and report, which was prepared by an independent company named Geomatrix and released on October 23, 2006.

 Appellants are indeed correct that, "[b]efore the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against this baseline that any significant environmental effects can be determined. (Guidelines, § 15125, 15126.2, subd. (a.).)" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952 [91 Cal.Rptr.2d 66] (*Amador*).) Accordingly, "[t]he Guidelines state that an EIR must include a description of 'the physical environmental conditions in the vicinity of the project' which constitute the 'baseline physical conditions' for measuring environmental impacts. (Guidelines, § 15125, subd. (a.).)" (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658 [57 Cal.Rptr.3d 663]; see also *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87 [99 Cal.Rptr.2d 378] (*Cadiz*).) We thus turn to the record to determine whether, as appellants claim, the description of baseline conditions in this case was inadequate because it omitted vital information regarding geological conditions at the proposed Athlete Center site.

The Geomatrix 2006 report, entitled Fault Rupture Hazard Investigation (Geomatrix 2006 Report) concluded that the proposed Athlete Center site was not located astride an active fault. This conclusion was later affirmed by peer review, and was approved and adopted by the University's Seismic Review Committee.

As appellants point out, there was no discussion of the Geomatrix 2006 Report in the DEIR, given that the report materialized after the DEIR's public comment period had ended. Nonetheless, the DEIR directly acknowledged that, as a *"significant and unavoidable"* impact of the Integrated Projects, people and structures would be exposed to potential substantial adverse seismic effects, including the risk of loss, injury, or death from rupture of a known earthquake fault or strong ground shaking.

The DEIR also identified and analyzed eight specific seismic hazards relating to the Integrated Projects. In particular, the DEIR disclosed that two of the Integrated Projects, the proposed Athlete Center and Maxwell Family Field parking structure, would be located within a delineated Alquist-Priolo earthquake fault zone (fault zone), but that neither would be constructed on a known active fault. Further, to ensure the accuracy of this statement, the DEIR advised that additional geological investigation (by Geomatrix) was underway at the Athlete Center site, and would be conducted at the Maxwell Family Field parking structure site prior to any actual development of the site. The results of these investigations, the DEIR advised, would ultimately be reviewed by and filed with the State Geologist.

When the EIR was released following release of the Geomatrix 2006 Report, it provided not only the above mentioned information regarding seismic hazards, but also a description of the geological investigation conducted by Geomatrix at the Athlete Center site, including Geomatrix's ultimate conclusion that known active faults did not extend to the Athlete Center footprint. Based at least in part on this investigation, the EIR then offered the University's ultimate conclusion that the "fault rupture 'risk' is quantitatively understood and the seismic design incorporates this understanding. While the design provides complete protection of life safety, the risk of damage to the structure cannot be completely mitigated by any design. Therefore, while the mitigations suggested below would reduce risks, this impact is considered significant and unavoidable."

Having considered this record, we reject appellants' claim that the University's description of baseline geological conditions at the proposed Athlete Center and Maxwell Family Field parking structure sites was inaccurate or incomplete. In doing so, we first note that both the DEIR and EIR clearly disclosed that the Athlete Center and the Maxwell Family Field parking structure would be located in a delineated fault zone. The DEIR also assured the public that neither project would be built across the trace of a known active fault, and that further geological investigation would be conducted before the sites were developed to confirm this fact. Most significantly, both the DEIR and EIR identified as a "significant and unavoidable" impact the fact that people or structures at the project sites could be exposed to potentially substantial adverse effects, including the risk of loss, injury, or death from rupture of a known earthquake fault or strong seismic ground shaking.

Appellants direct us to no evidence casting doubt on the accuracy of these statements. In particular, while appellants are correct in pointing out that Geomatrix confirmed the absence of active faulting at the project sites after the DEIR circulated for public comment, this fact does not contradict

the statement in the DEIR that "active faults are not known to be located within the footprint of the [Athlete Center]." Nor do we believe the EIR or the DEIR is incomplete or inaccurate due to two "inferred active faults" that are identified on a map of the Athlete Center site prepared by Geomatrix in 2001 (which are also mentioned in the Geomatrix 2006 Report). According to appellants, these "inferred active faults" prove there is "scientific uncertainty" surrounding the project's seismic risks that the University was required to disclose. As the trial court correctly noted, however, there is no requirement in CEQA or the Guidelines that an agency disclose the presence of an "inferred" earthquake fault, particularly where, as here, the agency discloses more generally the presence of significant seismic risks.[21]

 Finally, we acknowledge appellants' claim that the description of baseline geological conditions in the EIR is inadequate because it omitted the actual seismic study upon which the University's geological assessment was based. We, however, again disagree. As the trial court noted, the Geomatrix 2006 Report was not prepared to comply with CEQA; it was prepared to comply with the Alquist-Priolo Act, which, as discussed above, prohibits the construction of new structures across the trace of active faults, and limits the value of additions and alterations to structures previously built across the trace of active faults. Nowhere in CEQA or the Guidelines is there a requirement that an EIR include geological reports prepared pursuant to the Alquist-Priolo Act, even when a description of baseline conditions includes information derived from it. Nor will we infer any such requirement here. "[C]ourts, consistent with generally accepted rules of statutory interpretation, shall not interpret this division or the state guidelines adopted pursuant to

---

[21] To the contrary, section 15126.2 of the Guidelines requires an EIR to "identify and focus on the significant environmental effects of the proposed project," and "also [to] analyze any significant environmental effects the project might cause by bringing development and people into the area affected." As an example, the Guidelines note that "an EIR on a subdivision astride an *active fault line* should identify as a significant effect the seismic hazard to future occupants of the subdivision" because the development will "have the effect of attracting people to the location and exposing them to the hazards found there." (Guidelines, § 15126.2, italics added.) But the Guidelines contain no reference to inferred faults.

In addition, Appendix G to the Guidelines provides an "Environmental Checklist" to assist in CEQA compliance that asks whether the project could "[e]xpose people or structures to potential adverse effects, including the risk of loss, injury, or death involving: [¶] (1) Rupture of a known earthquake fault, as delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist for the area or based on other substantial evidence of a known fault." This again suggests known earthquake faults should be addressed in an EIR, yet is silent with respect to inferred faults.

In any event, as the EIR notes, the Geomatrix 2006 Report ultimately concluded that the previously inferred northern fault referenced in the Geomatrix 2001 report does not exist, and that the previously inferred southern fault is in fact the west trace of the Hayward Fault.

Section 21083 in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines." (§ 21083.1.)

Thus, having found no basis for concluding the description of baseline geological conditions in the DEIR or EIR was inadequate, we proceed to the next issue.

### 2. *Failure to Recirculate the DEIR.*

We next address appellants' related argument that the Regents violated mandatory CEQA procedures by failing to revise and recirculate the DEIR to include a discussion of the Geomatrix 2006 Report, as well as two letters written by the California Geological Survey and the United States Geological Survey (CGS/USGS) that responded to this report. Specifically, in certifying the EIR, the Regents expressly found "no new significant information was added to the EIR following public review and, thus, recirculation of the EIR is not required by CEQA." According to appellants, in deciding recirculation was unnecessary, the Regents "hid the ball" during the public review of the EIR regarding the seismic safety of the Integrated Projects.

 If significant new information is added to an EIR after it has been made available for public review, the EIR should be revised and recirculated for public comment before being certified by the lead agency. (Guidelines, § 15088.5, subd. (a); Pub. Resources Code, § 21092.1.) "[N]ew information is 'significant,' within the meaning of section 21092.1, only if as a result of the additional information 'the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect.' (Accord, CEQA Guidelines . . . , § 15088.5, subd. (a).) Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment." (*Vineyard Area, supra*, 40 Cal.4th at p. 447.)

We review an agency's decision not to revise and recirculate a DEIR only to ensure it is supported by substantial evidence. (Guidelines, § 15088.5, subd. (e).) In doing so, we resolve reasonable doubts regarding the agency's decision in favor of upholding the administrative decision. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1133, 1135 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

Here, we conclude substantial evidence supported the Regents' decision that "no new significant information" was revealed in the Geomatrix 2006

Report that required revision or recirculation of the DEIR. As we discussed above (see pp. 263–265, *ante*), the Geomatrix 2006 Report concluded that "active faults are not known to be located within the footprint of [the Athlete Center]," and that two previously "inferred" faults at the Athlete Center site did not exist. These conclusions are wholly consistent with the University's earlier statement in the DEIR that there was no evidence of active faults underlying the Athlete Center project site. Thus, rather than revealing significant new information regarding the existence or severity of the project's environmental impacts, the report merely confirmed and, indeed, provided further reassurance regarding what had already been disclosed to the public in the DEIR. (See *Laurel Heights II, supra*, 6 Cal.4th at p. 1137 [affirming the decision to not recirculate an EIR where new studies released after public review "merely serve to amplify . . . the information found in the draft EIR" and "do not alter th[e] analysis in any way"].)

We reach a similar conclusion with respect to the CGS/USGS letters, which were written in December 2006 in response to a request by the City of Berkeley (the City) to review the Geomatrix 2006 Report and to explain its technical aspects. In these letters, the CGS/USGS concurred with Geomatrix that active faulting did not exist within the majority of the Athlete Center footprint, yet disagreed that faulting could be ruled out in a small portion of the northeast corner of the Athlete Center footprint based on the data provided in the report. The agencies also opined that additional subsurface investigation should be conducted "to better confirm the presence or absence of a Holocene fault at the northeastern and southeastern ends of the [Athlete Center] footprint." While recommending this additional study, however, the CGS/USGS letters contained no actual evidence contradicting the conclusion in both the Geomatrix 2006 Report and the DEIR that the project site was free of active faulting, a conclusion independently reviewed and approved by both a reputable peer company and by the University's Seismic Review Committee before being accepted by the Regents. Nor did these letters provide evidence of any previously undisclosed significant environmental impact, a substantial increase in the severity of a previously disclosed impact, or a new feasible alternative or mitigation measure for the project. Rather, as previously discussed, both the DEIR and EIR identified the presence and severity of seismic risks at the project sites, and acknowledged the "significant and unavoidable" nature of these risks. As such, the letters did not require revision or recirculation of the DEIR. (See Guidelines, § 15088.5.) As the California Supreme Court has explained, "Recirculation was intended to be an exception, rather than the general rule."[22] (*Laurel Heights II, supra*, 6 Cal.4th at p. 1132.)

---

[22] We acknowledge appellants' claim that public awareness of the CGS/USGS letters might have prompted further geological investigation of the Athlete Center site. However, even if we assume further investigation of the project site would have yielded new information, "CEQA

Finally, having already found no legal basis for requiring the Regents to revise or recirculate the DEIR, we simply note that, even without an opportunity to respond specifically to the Geomatrix 2006 Report or the CGS/USGS's responsive letters, the public had ample opportunity to assist the University in reaching an informed decision regarding the seismic impacts of the Integrated Projects. After the DEIR disclosed a significant and unavoidable impact based on the projects' close proximity to active faulting, the Regents received a wealth of public comments and petitions. In a detailed response set forth in the EIR, the University promised to take reasonable steps to reduce seismic risks, including by employing reputable engineers for the design process and consulting with an expert seismic review committee, but nonetheless reiterated that the projects' seismic impacts remained "significant and unavoidable." Given the comprehensive public exchange regarding these impacts, we believe the underlying purposes of CEQA were adequately served even without additional public review of the EIR following release of the Geomatrix 2006 Report and the CGS/USGS letters. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1132.)

### 3. *Failure to Disclose Expert Disagreement.*

In yet another variation of the preceding argument, appellants contend the Regents violated CEQA by failing to disclose a "disagreement" between CGS/USGS and Geomatrix regarding the adequacy of the geological investigation at the Athlete Center site.

■■■ A lead agency commits a prejudicial abuse of discretion by omitting relevant information from an EIR if the omission, contrary to CEQA's underlying goals, precludes informed decisionmaking and public participation. (§ 21005, subd. (a) ["noncompliance with the information disclosure provisions of this division which precludes relevant information from being presented to the public agency . . . may constitute a prejudicial abuse of discretion . . . , regardless of whether a different outcome would have resulted if the public agency had complied with those provisions"]; Guidelines,

does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required. (CEQA Guidelines, § 15204, subd. (a); *Cadiz, supra,* 83 Cal.App.4th at p. 102; *Society for California Archaeology v. County of Butte* (1977) 65 Cal.App.3d 832, 838–839 [135 Cal.Rptr. 679].)" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396 [133 Cal.Rptr.2d 718].) Moreover, it is the public agency responsible for developing a project, in this case the Regents, that has ultimate responsibility for determining whether a project complies with CEQA. Neither the CGS nor the USGS has authority to approve or disapprove projects situated in or near earthquake fault zones or to order geologic investigations of those projects. (See *Better Alternatives, supra,* 212 Cal.App.3d 663, 671.)

§ 15151; see also *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 492 [82 Cal.Rptr.2d 705]; *Amador, supra,* 76 Cal.App.4th at p. 946.)

Here, we conclude the Regents committed no abuse of discretion in omitting from the EIR a discussion of the CGS/USGS letters. As we have already discussed at length, the EIR disclosed in no uncertain terms that it was "significant and unavoidable" that the Integrated Projects could expose people or structures to the risk of loss, injury, or death from rupture of a known earthquake fault or strong seismic ground shaking, due to their proximity to the Hayward Fault. While the CGS/USGS maintained the view that Geomatrix should conduct further investigation of the Athlete Center site in two respects, they voiced no "disagreement" with the EIR's disclosure on this subject.

Even if the EIR's discussion of seismic impacts was not perfect, it was adequate, complete, and made in good faith, which is all CEQA requires. (See *In re Bay-Delta etc., supra,* 43 Cal.4th at p. 1174.)

### 4. *Adequacy of the Project Description.*

Appellants next contend the EIR's description of the Integrated Projects is inadequate because it lacks the degree of specificity CEQA requires for a "project-level" EIR. Appellants provide two examples to support their argument. First, appellants claim the description of the proposed Maxwell Family Field parking structure is inadequate because "[s]cant information is given about the five-story structure and how it and its considerable traffic would be integrated with the playing fields and adjacent structures." Second, they claim the description of the proposed Law and Business Connection Building is inadequate because, while stating that a 300-person auditorium and 200-person cafe *may* be included, it "avoids committing respondents to any even general course of action." The project description also states that the Law and Business Connection Building *may* be constructed with " 'green' materials" or utilize pervious surfaces, but only if " 'found physically and economically feasible.' " According to appellants, "[w]hether the University employs green or pervious roofs will have a major impact on storm water runoff generated and energy used by the Integrated Projects," and thus should have been determined in advance of the EIR.

"EIR requirements must be 'sufficiently flexible to encompass vastly different projects with varying levels of specificity.' (*Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 374 [7 Cal.Rptr.2d 307].)" (*Al Larson, supra,* 18 Cal.App.4th 729, 745–746.) With respect to an EIR's project description, only four items are mandatory: (1) a detailed map

with the precise location and boundaries of the proposed project, (2) a statement of project objectives, (3) a general description of the project's technical, economic, and environmental characteristics, and (4) a statement briefly describing the intended uses of the EIR and listing the agencies involved with and the approvals required for implementation. (Guidelines, § 15124.) Aside from these four items, the Guidelines advise that the project description should not "supply extensive detail beyond that needed for evaluation and review of the [project's] environmental impact." (Guidelines, § 15124.)

Here, appellants do not dispute that the EIR, labeled a "project EIR," contains a description for each of the Integrated Projects which includes the four items required under Guidelines section 15124. This description includes, for example, detailed maps of each project's location and boundaries, a list and discussion of the projects' seven key objectives,[23] the general plan for each project, and a statement describing the intended uses of the EIR and listing the public agencies involved in approving and implementing the EIR.

Specifically, with respect to the Maxwell Family Field and Law and Business Connection Building projects, which are the focus of appellants' challenge, the project description includes the above described four items required under Guidelines section 15124, as well as detailed design drawings and discussions of the projects' seismic safety and the environmental impacts of their anticipated construction and demolition activities. The project description also identifies and briefly discusses the projects' primary characteristics with respect to circulation, lighting, sound, landscaping, size, capacity, heating and cooling, construction schedules and seismic improvements. These project characteristics, in many instances, are then discussed in more detail in other chapters of the EIR. For example, relevant to appellants' concern that the project description lacks sufficient information about the Maxwell Family Field parking structure's "considerable traffic," the EIR has a 60-page chapter on transportation and traffic, in which there are several discussions related specifically to the new parking structure and its impacts on vehicle, bicycle and pedestrian traffic. Among other things, this chapter evaluates the number of regular vehicle trips and project-related vehicle trips likely to be generated by the Maxwell Family Field parking structure during peak hours (compared to those generated by existing parking facilities), and the resulting impacts to traffic levels at intersections.[24]

---

[23] The legal adequacy of the EIR's statement of objectives is discussed in greater detail below. (See pp. 272–274, *post.*)

[24] Based on these evaluations, the EIR identifies as a significant impact the fact that new vehicle trips generated by the Maxwell Family Field parking structure will degrade conditions at the Gayley Road/Stadium Rim Way intersection to an unacceptable level. To mitigate this impact, the EIR thus requires the University to install a signal at the intersection before

We conclude based on this record that the EIR's project description of the proposed Maxwell Family Field parking structure and the Law and Business Connection Building meets the requirements of Guidelines section 15124, particularly in light of its admonishment that such description should not "supply extensive detail beyond that needed for evaluation and review of the [project's] environmental impact."[25] (Guidelines, § 15124.)

We acknowledge appellants' point that the EIR provides more detail regarding the Athlete Center project (i.e., phase I of the Stadium project) than the other Integrated Projects. The Regents explain this circumstance by noting that the Athlete Center project was the only project being presented for final approval in connection with the EIR's certification. The Regents insist that, in accordance with CEQA, additional EIR's will be prepared at a later date if the amount of detail provided for any of the other Integrated Projects proves inadequate. (See § 21166; Guidelines, § 15385.) This commitment is set forth in the EIR.

█ Given our previous conclusion that the EIR's project description meets the requirements of Guidelines section 15124, we believe the Regents' commitment to prepare additional EIR's in the future, if necessary, was not improper. CEQA requires a lead agency to prepare an EIR for a project " 'at the earliest possible stage,' " yet, at the same time, it recognizes "additional EIRs might be required for later phases of the project." (*City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 250 [227 Cal.Rptr. 899].) As such, CEQA permits a lead agency to use "tiering" to "defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval . . . ." (*Vineyard Area, supra*, 40 Cal.4th at p. 431.) In particular, tiering is appropriate " 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1170.) Further, where an EIR covers several possible projects that are diverse and geographically dispersed, the agency has discretion to evaluate the potential environmental impacts of the individual projects in general terms in the EIR, while deferring more detailed evaluation of the projects for future EIR's. (*Id.* at pp. 1170–1171; see

---

completion of the Maxwell Family Field parking structure. The EIR also requires the University to, among other things, design and install a protected pedestrian crossing on Gayley Road before completion of the structure to reduce significant impacts to pedestrian traffic in this area.

[25] The fact that this EIR is labeled a "project" rather than a "program" EIR matters little for purposes of this inquiry. "The level of specificity of an EIR is determined by the nature of the project and the 'rule of reason' (*Laurel Heights [I], supra*, 47 Cal.3d at p. 407), rather than any semantic label accorded to the EIR." (*Al Larson, supra*, 18 Cal.App.4th at pp. 741–742, fn. omitted; see also Guidelines, § 15146.)

also Guidelines, § 15165.) This deferral may be appropriate, for example, where no "approval" of specific projects has taken place in connection with an EIR. (*Al Larson, supra*, 18 Cal.App.4th at p. 744.)

In this case, the EIR contains sufficient detail to permit reasonable and meaningful environmental review of each of the Integrated Projects, but, in particular, of the Athlete Center project—the only project ready for the Regents' final approval in connection with the EIR's certification. At the same time, the EIR acknowledges further analysis may be required if new or different facts surface with respect to any of the individual projects. On this record, the Regents' deferral of additional environmental review is appropriate.[26] (*Rio Vista Farm Bureau Center v. County of Solano, supra*, 5 Cal.App.4th 351, 373 ["Where . . . an EIR cannot provide meaningful information about a speculative future project, deferral of an environmental assessment does not violate CEQA."]; see also *Al Larson, supra*, 18 Cal.App.4th at p. 744.)

### 5. Adequacy of the Statement of Objectives.

We next consider appellants' related claim that the EIR's statement of objectives is impermissibly vague. Relevant to this claim, the Guidelines explain that a "clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . . The statement of objectives should include the underlying purpose of the project." (Guidelines, § 15124, subd. (b).)

Here, the EIR identifies seven primary objectives for the Integrated Projects: (1) to provide seismically safe facilities for students, staff and visitors; (2) to promote and inspire relationships vital to the health of the University: between athletics and academics, among academic units, and between the University and the public, including community and neighbors, alumni, prospective students and donors; (3) to enhance remarkable historic places and create extraordinary new spaces in the southeast campus; (4) to

---

[26] Indeed, appellants' challenge here may prove too much. For example, they claim the description of the Law and Business Connection Building project is inadequate because it does not commit the University to a definite plan with respect to the building facilities or roof materials. However, they point to no evidence suggesting that the University deliberately withheld information regarding this project or any other project. We assume that, had more relevant information been available, it would have been included in the EIR. " '[C]ourts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1175.) Moreover, in the event the Regents renege on their promise to provide additional environmental review for later phases of the Integrated Projects if such review becomes necessary under CEQA, appellants remain free to reassert their legal challenge. (§ 21166.)

facilitate access to, between, and through the Integrated Projects for vehicles, transit, bicycles, pedestrians, disabled persons and emergency services and vehicles; (5) to increase the functionality of existing spaces and facilities in the southeast campus; (6) to consolidate parking and reduce the prevalence of surface parking in the southeast campus; and (7) to implement policies of the 2020 LRDP EIR, including those related to seismic safety, collaboration and interaction among different disciplines, parking, stewardship, and access to all users at all levels of mobility.

In fleshing out these objectives, the EIR offers the following insight into the Stadium project: "The California Memorial Stadium component of the Integrated Projects responds to the need for seismic strengthening of the [Stadium] to reduce life safety risks to occupants and visitors. The [Stadium] proposal is a keystone to efforts to enhance and maintain the image of the [University] campus, including its historic legacy of landscape and architecture. Additional goals . . . are to develop a world class student athlete training facility and to provide adequate game day event facilities. . . ." To this end, the Athlete Center phase of the Stadium project will "address significant current deficiencies in the quality and quantity of athlete training and development facilities by providing facilities that are comparable with other top tier Division 1 athletic programs; decant the [Stadium] to facilitate seismic upgrade of the historic building; better integrate the [Stadium] with the campus and the site to improve the game[-]day access to the stadium and the game-day experience for visitors; alter the character of the [Stadium] environs, currently marked by high cyclone fencing and surface parking, to create a more appealing daily use facility for the campus, while preserving a wooded foreground for the [Stadium]."[27]

Appellants challenge these statements, arguing that "many of the Integrated Projects EIR's stated project objectives are so vague and amorphous that they could be fulfilled by almost any project, rendering them useless for their intended purpose of assisting evaluation of alternatives."

In addressing this challenge, we acknowledge certain of the stated objectives of the Integrated Projects—such as the desire to create "extraordinary new spaces" and to "promote and inspire relationships"—are stated broadly. However, when considered as a whole, we conclude the objectives chosen by the University do in fact serve the requisite purpose of assisting in the development and evaluation of a reasonable range of alternatives to the Integrated Projects. For example, without reference to the University's objective of consolidating parking and reducing the prevalence of surface parking

---

[27] Recall that the Athlete Center would provide a new permanent home for several athletic programs currently housed in the Stadium, which would allow for the Stadium's seismic upgrading planned for phase II of the Stadium project.

in the southeast campus, an informed decision could not be made regarding the beneficial uses of the Maxwell Family Field parking structure. Similarly, while perhaps stated more broadly than necessary, the objectives of creating extraordinary new spaces and increasing functionality of existing spaces in the southeast campus do provide an appropriate frame of reference for intelligently comparing the Stadium project to its proposed alternatives (which, as we will discuss in detail below, include relocating the Athlete Center to other sites both on and off campus). This is just what CEQA requires. (Guidelines, § 15124, subd. (b); *In re Bay-Delta etc., supra,* 43 Cal.4th at p. 1164 [objectives chosen should be broad enough to permit a reasonable range of alternatives].) Accordingly, appellants' challenge in this regard fails.

### 6. *Adequacy of the Project Alternatives Discussion.*

If the EIR is the "heart" of CEQA, the mitigation and alternatives discussion forms the EIR's "core." (*In re Bay-Delta etc., supra,* 43 Cal.4th at p. 1162.) Here, the EIR describes five alternatives to the Integrated Projects: (1) an alternative in which none of the projects would be pursued ("no project" alternative), which CEQA requires to be included in an alternatives discussion (see Guidelines, § 15126.6, subd. (e)); (2) an alternative that would implement all of the projects except the proposed Maxwell Family Field parking structure ("no parking" alternative); (3) an alternative that would implement all of the projects, but with smaller footprints for the proposed Athlete Center, the Law and Business Connection Building, and the Maxwell Family Field parking structure, and less extensive improvements to the Stadium ("reduced size" alternative); (4) an alternative that would relocate three of the projects—the Athlete Center, the Maxwell Family Field parking structure, and the College Avenue houses—to different sites in Berkeley[28] ("dispersal to Berkeley" alternative); and (5) an alternative that would relocate the Athlete Center to, and would construct a new stadium at, the current site of the Golden Gate Fields horse racetrack complex in Albany ("dispersal to Albany" alternative).

In challenging the EIR's discussion of project alternatives, appellants focus on the methodology employed to analyze and compare these alternatives. Specifically, appellants challenge the University's decision in the EIR to group components of the alternatives together and then to compare these "integrated" alternatives to the Integrated Projects as a whole, rather than to compare individual components of the alternatives to the individual projects that make up the Integrated Projects. For example, under the "dispersal to Berkeley" alternative, the EIR considers relocating a group of three projects

---

[28] Under this alternative, the College Avenue houses would be preserved rather than demolished.

to sites in Berkeley rather than relocating individual projects to Berkeley. Similarly, under the "reduced size" alternative, the EIR considers using smaller footprints for a group of three projects rather than for any individual project. Finally, under the "no project" alternative, the EIR considers pursuing none of the projects, rather than just forgoing the Stadium project or one of the other projects. According to appellants, these examples reflect a deliberate strategy by the University to make each alternative less feasible or desirable than the proposed project.

In response to appellants' challenge, the Regents note that "[CEQA's] 'range of alternatives' requirement applies only to the project *as proposed by the agency with whatever objectives the agency seeks*." Here, the agency proposed a collection of projects—to wit, the Integrated Projects—as the subject of the EIR. The agency then identified specific objectives the Integrated Projects were collectively designed to meet. Under these circumstances, the Regents argue, it was wholly reasonable to select a range of alternatives for the Integrated Projects as a whole rather than for any individual component of the Integrated Projects.

In making this argument, the Regents direct us to the EIR, which explains that an "integrated" approach to project alternatives was chosen as the methodology that would best parallel the Integrated Projects themselves: "CEQA requires analysis of alternatives that could attain most of the project objectives, and for an alternative to meet these project objectives, it must include most of the components of the Integrated Projects. . . . [¶] However, the groupings of alternatives in the Draft EIR do not limit the ability of the UC Regents to select individual alternative projects from among them. Rather than an 'all-or-nothing' situation, the consideration of alternatives allows for a 'mix-and-match' approach, in which components from different alternatives may be substituted for one another." The EIR also points out that much of the analysis in the DEIR was actually performed on an individual project basis. For example, the DEIR includes a comparison matrix in which each component of each alternative is analyzed and compared against its corresponding component of the Integrated Projects.

To properly address this challenge, we begin with the oft-stated principle that absolute perfection is not the standard governing a lead agency's proposed range of project alternatives. Rather, in preparing an EIR, a lead agency need only make an objective, good faith effort to provide information permitting a reasonable choice of alternatives that would feasibly attain most of the basic objectives of the project, while avoiding or substantially lessening the project's significant adverse environmental impacts. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 406–407; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco*

(1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401].) To that end, an EIR's discussion of alternatives must be reasonably detailed, but not exhaustive. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163 ["An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible."]; Guidelines, § 15126.6.) The key issue is whether the alternatives discussion encourages informed decisionmaking and public participation. (*Laurel Heights I, supra*, 47 Cal.3d at p. 404.) Here, we believe the EIR's alternatives discussion meets this standard.

Initially, we note the EIR identifies five alternatives to the Integrated Projects, and then analyzes and compares the significant environmental impacts of each in matrix and narrative format, focusing on 10 specific issue areas: aesthetic resources, biological resources, cultural resources, geology/seismicity/soils, hydrology/water quality, land use, noise, public services—emergency access, transportation and traffic, and utilities and service systems. The EIR also responds to public comments regarding the adequacy of this discussion by providing information and matrices comparing the alternatives beyond that which was included in the DEIR. Finally, the EIR contains an analysis of each alternative's capacity to meet the stated objectives of the Integrated Projects.[29]

As appellants point out, the University ultimately rejected each of the five proposed alternatives after concluding none could feasibly attain most of the Integrated Projects' objectives. In doing so, the University indeed took an "integrated" approach, comparing each alternative, including all of its components, to the Integrated Projects as a whole. Contrary to appellants' claims, however, we see nothing wrong with this approach.

In particular, we believe appellants ignore that much of the EIR's analysis does in fact relate to individual components of the projects and their alternatives. For example, as appellants concede in a footnote, the "no parking" alternative is "in effect a no project alternative for the Maxwell Family Field Parking Garage Proposal," and the "dispersal to Albany" alternative is "specific to the Stadium Project and does not address any of the other six Integrated Projects."

▮ Moreover, appellants ignore that CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a

[29] After setting forth these analyses, the EIR designated the "no project" alternative as the environmentally superior alternative, given that it would result in the fewest significant, unavoidable impacts. (See Guidelines, § 15126.6, subd. (e).) The EIR noted, however, this alternative would meet none of the project objectives. The EIR thus designated the "reduced size" alternative as an additional environmentally superior alternative. (See *ibid.*) In doing so, the EIR noted the "reduced size" alternative has advantages over other alternatives with respect to aesthetics, cultural resources, noise, public services/emergency access, utilities/services, and transportation/traffic.

particular set of objectives. CEQA simply requires the agency to thereafter prepare and certify a legally adequate EIR that provides the agency and the public alike with detailed information regarding the proposed project's significant environmental impacts, as well as reasonable alternatives that "would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen [those impacts]." (Guidelines, § 15126.6, subd. (a); see also *In re Bay-Delta etc., supra*, 43 Cal.4th at pp. 1161–1162.) As this language demonstrates, CEQA clearly recognizes the agency will look to the proposed project's particular objectives when developing its range of project alternatives. (Guidelines, §§ 15124, subd. (b), 15126.6.)

Here, the University identified the "project" for purposes of CEQA as the Integrated Projects, and then identified specific objectives the Integrated Projects were, collectively, designed to meet. We have already concluded the EIR's statement of objectives was adequate. (See pp. 272–274, *ante*.) It thus would make little sense to now fault the University for developing a range of alternatives that "would feasibly attain most of the basic objectives of the project . . . ." (Guidelines, § 15126.6, subd. (a).) As the California Supreme Court has held, "an EIR need not study in detail an alternative that is infeasible or that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose." (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1165.)

Accordingly, we conclude the University complied with CEQA by making an objective, good faith effort to provide in the EIR a meaningful discussion of a range of reasonable project alternatives. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 406–407.)

### 7. *Adequacy of the Discussion of Impacts to Archaeological Resources.*

Appellants also challenge the EIR's treatment of archaeological resources potentially impacted by the Integrated Projects. Specifically, appellants claim the EIR fails to fully disclose and address the Integrated Projects' adverse impacts on archaeological resources, and abandons mitigation measures related to those impacts that were adopted under the 2020 LRDP EIR.

The following legal principles are relevant to this challenge. "If the lead agency determines that the project may have a significant effect on unique archaeological resources, the environmental impact report shall address the issue of those resources. An environmental impact report, if otherwise necessary, shall not address the issue of nonunique archaeological resources." (§ 21083.2, subd. (a).) "Public agencies should, whenever feasible, seek to avoid damaging effects on any historical resource of an

archaeological nature. . . . [¶] (A) Preservation in place is the preferred manner of mitigating impacts to archaeological sites." (Guidelines, § 15126.4, subd. (b)(3).)

Here, the EIR discloses that the Integrated Projects' ground-disturbing activities "have the potential to destroy any extant prehistoric archaeological resources that may lie beneath the project area." The University's archival review of certain archaeological reports on campus "indicated a high likelihood of locating prehistoric archaeological sites within the project boundaries, given the location of previously recorded sites and the proximity of the Integrated Projects Area to the historic course of Strawberry Creek. Prehistoric settlements in the East Bay were often situated along or near the banks of creeks or other fresh water sources." Nonetheless, to ensure adequate treatment of any archaeological resource that may be located at the project sites, including the Athlete Center site, the University promised the Integrated Projects would incorporate the mitigation measures and continuing best practices originally set forth in the 2020 LRDP EIR, the implementation of which would reduce these impacts to less than significant levels.[30]

The mitigation measures and continuing best practices referred to in the EIR, which were expressly adopted by the Regents as conditions for approving the Athlete Center project and certifying the EIR, include the following: (1) 2020 LRDP EIR Mitigation Measure CUL-4-a, requiring the University to create a UC Berkeley "Campus Archaeological Resources Sensitivity Map" and, to the extent a proposed project would affect any archaeological resource, to take specific action before any construction or demolition activities to either relocate the project site or, in consultation with a qualified archaeologist, determine the appropriate level of archaeological investigation for the project site and activity; (2) 2020 LRDP EIR Continuing Best Practice CUL-4-a, requiring the University, in the event an archaeological resource is identified at a project site, to retain a qualified archeologist to ascertain and record the extent of the resource relative to the project area of potential effects and, if the resource is determined to be a historical resource or unique archaeological resource under CEQA, to consult with the archeologist to provide and implement an appropriate plan; (3) 2020 LRDP EIR Mitigation Measure CUL-4-b, requiring the University, if an archaeological resource is discovered during project construction, to stop all soil-disturbing work within 35 feet and to contact a qualified archeologist to provide and implement an appropriate plan; (4) 2020 LRDP EIR Continuing Best Practice CUL-4-b, requiring the University, in the event human remains are discovered during construction, to, among other things, notify the county coroner, who must

---

[30] The 2020 LRDP EIR noted that prehistoric archaeological resources had been identified within the Campus Park planning area, and that a human burial site had been encountered during construction of the Stadium in the 1920's.

notify the Native American Heritage Commission; and (5) 2020 LRDP EIR Continuing Best Practice CUL-4-c, requiring the University to notify contractors before beginning any soil-disturbing activities of their duty to watch for the presence of archaeological resources at the project site, and to notify the University in the event such resources are found so that 2020 LRDP EIR Mitigation Measure CUL-4-b can be implemented.

Based on this record, we agree with the trial court that the EIR contains "a sufficient analysis of archaeological resources and potential impacts" and "provide[s] for appropriate protection for any type of resource that might be discovered during implementation of the Integrated Projects." In particular, substantial evidence reflects that, as conditions of their approval for the Athlete Center project and certification of the EIR, the Regents adopted several mitigation measures and continuing best practices specifically designed to protect archaeological resources at the project sites by reducing adverse impacts to those resources to a less than significant level. Exercising our duty to " 'resolve reasonable doubts in favor of the administrative finding and decision' " (*Laurel Heights I, supra*, 47 Cal.3d at p. 393), we interpret these actions by the Regents as a firm commitment to comply with those practices and measures in order to ensure adequate mitigation. (See *id.* at pp. 420–421 [finding substantial evidence in support of a finding that a project's adverse impacts would be adequately mitigated where the "EIR can be fairly read as a firm commitment by [the agency] to comply with sound practices"].) Accordingly, we conclude the discussion of archaeological resources in this EIR complies fully with CEQA. (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1397 [an EIR's discussion of potential significant impacts is adequate so long as it "contains sufficient information and analysis to enable the public to discern the analytic route the agency traveled from evidence to action"].)

In reaching this conclusion, we reject appellants' claim that the University somehow "alter[ed]" the 2020 LRDP EIR's mitigation measures when preparing the EIR, and now promises "only to take 'appropriate steps' to ensure that resources are protected." Appellants rely on a public comment from a self-described "historian," who refers to 18 Indian burial sites the University encountered when first constructing the Stadium in 1923. In response to this comment, the University promises that, should ground-disturbing activities occur in areas where the burials were found, it would "take appropriate steps to ensure any resources that may be present are properly treated in accordance with archaeological protection laws." This public comment was made in response to the 2020 LRDP EIR, not to the EIR in this case. As such, any challenge related to it comes too late. (See §§ 21167, subd. (c), 21167.2 [establishing a 30-day limitations period for commencing proceedings to challenge an EIR].) Further, in any event, while appellants are correct to point out that mitigation measures in an EIR must be fully

enforceable (§ 21081.6, subds. (a), (b); Guidelines, § 15126.4, subd. (a)(2)), and cannot be abandoned without a legitimate reason (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 359 [110 Cal.Rptr.2d 579]), we find no evidence in this record that the Regents have breached these principles.

### 8. Adequacy of the Discussion of Impacts to Biological Resources.

Appellants next challenge the EIR's handling of the impacts to biological resources resulting from the removal of several coast live oak trees in the Memorial Oak Grove west of the Stadium to allow for the Athlete Center's construction. According to appellants, the EIR violates CEQA by referring the reader to the discussion of biological resources in the 2020 LRDP EIR rather than directly addressing the issue. Appellants further claim the 2020 LRDP EIR's discussion of this issue was itself inadequate. The following principles guide our inquiry.[31]

CEQA requires an EIR to discuss a project's potential impacts to biological resources if the lead agency determines those impacts are "significant." (§§ 21002.1, 21081.) Further, where, as here, a project-level EIR tiers from an earlier program-level EIR, the project-level EIR "need not examine those effects which the lead agency determines were either (1) mitigated or avoided . . . as a result of the prior environmental impact report, or

---

[31] Before turning to the merits of this argument, we briefly discuss an issue not raised by the parties, but nonetheless of clear relevance to the matter at hand—whether consideration of the EIR's discussion of biological impacts has been rendered moot by the University's actual removal of trees from the Memorial Oak Grove following entry of the trial court's order and the subsequent denial of appellants' petition for writ of supersedeas, by which they had sought to prevent the start of construction at the Athlete Center site. Under Guidelines section 15233, when an injunction is not granted after commencement of a CEQA action, the agency may assume the challenged EIR complies with CEQA. However, "[a]n approval granted by a responsible agency in this situation provides only permission to proceed with the project at the applicant's risk prior to a final decision in the lawsuit." (Guidelines, § 15233, subd. (b); see also *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1203 [22 Cal.Rptr.3d 203].) "Failure to obtain an injunction should not operate as a de facto waiver of the right to pursue a CEQA action." (*Bakersfield Citizens*, at p. 1203.) "As conditions of reapproval [of a project], the [lead agency] may compel additional mitigation measures or require the projects to be modified, reconfigured or reduced. The [agency] can require completed portions of the projects to be modified or removed and it can compel restoration of the project sites to their original condition." (*Id.* at p. 1204.) Applying this authority here, we are confident appellants' challenge to the EIR with respect to biological impacts remains a live issue. (See also *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 889–890 [92 Cal.Rptr.2d 268] [refusing to find moot the issue of whether an EIR was CEQA compliant even though construction had begun because "the project can be modified, torn down, or eliminated to restore the property to its original condition," and because defendants "chose to continue with the project despite the risk that pending litigation could result in rescission of the City's action approving it."].)

(2) examined at a sufficient level of detail in the prior environmental impact report to enable those effects to be mitigated or avoided by site specific revisions, the imposition of conditions, or by other means in connection with the approval of the later project." (§ 21094, subd. (a).) "Future environmental documents may incorporate by reference general discussions from the broader EIR, but a separate EIR is required for later projects that may cause significant environmental effects inadequately addressed in the earlier report." (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1173, citing Guidelines, § 15152, subds. (a) & (f).)

Here, as the Regents point out, the EIR tiers from the 2020 LRDP EIR. In addition, the EIR's notice of preparation expressly advises that the "[EIR] will rely on the 2020 LRDP EIR for consideration of environmental effects in the following resource areas: . . . Biological Resources . . . ."

The 2020 LRDP EIR, in turn, contains 37 pages of discussion relating to the biological impacts of all projects proposed under the program, including the Integrated Projects. As appellants note, nearly all of this discussion focuses on the University's Hill Campus and Campus Park areas, both of which contain sensitive biological resources. With respect to impacts to biological resources in other areas of campus, including the Memorial Oak Grove, the 2020 LRDP EIR explains its failure to include further discussion as follows: "The remaining land use zones addressed as part of the LRDP [(i.e., those other than Hill Campus and Campus Park)] occur in urbanized areas with little or no remaining natural vegetation and limited wildlife habitat values. No sensitive natural communities, special-status species, wetlands or important wildlife movement corridors occur in these zones. Given the absence of any sensitive biological or wetland resources, no additional discussion or analysis is provided for the other land use zones in this section of the EIR."

Thus, as this statement in the 2020 LRDP EIR reflects, the University does not consider the coast live oaks in the Memorial Oak Grove to be sensitive biological resources warranting further discussion for purposes of environmental review.

Below, the trial court found substantial evidence in support of the University's position that the Memorial Oak Grove trees are not sensitive biological resources. In particular, the trial court accepted the 2020 LRDP EIR's description of the area containing the Memorial Oak Grove as "urbanized . . . with little or no remaining natural vegetation . . . ." In doing so, the trial court pointed out, for example, that the area consists of planting beds separated by seven 15-foot-wide asphalt pedestrian pathways leading to two sets of concrete stairs with galvanized steel handrails. In addition, the area is

surrounded on all sides by urban development—east of the Memorial Oak Grove is the Stadium, west is a heavily trafficked public roadway, and south and north are parking lots.

We agree, based on this record, that substantial evidence supports the University's position that the Memorial Oak Grove trees are not sensitive biological resources. Indeed, as the Guidelines acknowledge, the "determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved . . . ," and an "ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting." (Guidelines, § 15064, subd. (b).) Here, the record reflects that the University used careful judgment in deciding that the urban setting in which these trees were planted lessened their biological significance. As such, the Regents were not required to adopt mitigation measures with respect to these trees before certifying the EIR. (*Ibid.*; § 21002.1, subd. (e); see also *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 375 [54 Cal.Rptr.3d 485] ["a lead agency has the discretion to determine whether to classify an impact described in an EIR as 'significant,' depending on the nature of the area affected"].)

Moreover, we note, as did the trial court, that evidence exists in the record indicating that, although not required to by CEQA, the University took several actions to protect the Memorial Oak Grove trees from the impacts of the Integrated Projects. For example, the 2020 LRDP EIR committed the University to continuing implementation of the "Campus Specimen Tree Program" to reduce adverse affects to specimen trees and flora at the project sites. Approximately 90 trees in the area west of the Stadium were identified as "specimen trees," 43 of which were located at the site of the proposed Athlete Center.[32] Under this program, the University's retention of existing specimen trees and flora is deemed "a priority in the final design of proposed projects." Projects, including the Integrated Projects, thus must be designed and constructed in a manner that, to the full extent feasible, minimizes removal of or damage to specimen trees. To that end, every specimen tree impacted by development activities should be relocated or replaced with three trees of a comparable size.

To implement the Campus Specimen Tree Program, the 2020 LRDP EIR includes Continuing Best Practice BIO-1-a, which was specifically incorporated into the EIR—a fact appellants ignore. This best practice provides that "[r]eplacement landscaping will be provided where specimen resources are

---

[32] To be identified as a "specimen" by the campus landscape architect, a tree must be healthy, pose no safety risks, and either be of historical, aesthetic or educational importance, or contribute to the overall health of certain identified natural areas on campus.

adversely affected, either through salvage and relocation of existing trees and shrubs or through new plantings of the same genetic strain, as directed by the Campus Landscape Architect." Based on Continuing Best Practice BIO-1-a, the 2020 LRDP EIR concludes any impact from loss of specimen trees, including coast live oaks, would be less than significant.[33]

Given this record, we conclude the EIR's treatment of adverse impacts to biological resources was more than adequate.

### 9. *Adequacy of the Regents' Findings.*

Under CEQA, a lead agency is prohibited from approving a project for which an EIR has been certified unless the agency makes at least one written "finding," accompanied by an explanation for this finding, for each significant environmental effect identified in the EIR. (Guidelines, § 15091, subd. (a).) The possible findings the agency may make for purposes of this section are as follows: (1) alterations to the project are required to be or have been incorporated into the project to avoid or substantially lessen the significant environmental effect identified in the EIR; (2) such alterations are within the responsibility and jurisdiction of another public agency, rather than the agency making the finding, and have been or can and should be adopted by that other agency; or (3) the mitigation measures or project alternatives identified in the EIR are infeasible due to specific economic, legal, social, technological, or other considerations. (*Ibid.*)

An agency's findings in support of certifying an EIR must be supported by substantial evidence. (Guidelines, § 15091, subd. (b); *Laurel Heights I, supra,* 47 Cal.3d at pp. 392–393.) Substantial evidence in this context means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might be reached." (Guidelines, § 15384, subd. (a).)

Here, appellants contend certification of the EIR was flawed because certain of the Regents' findings in support of it were not supported by substantial evidence. Specifically, appellants challenge (1) the finding that the Integrated Projects will have no cumulative impacts on cultural resources after mitigation measures are implemented with "one possible exception"—

---

[33] Reflective of the University's acceptance of Continuing Best Practice BIO-1-a, the EIR includes a thematic response to public concern regarding the removal of trees from the Memorial Oak Grove, in which it recognizes the historical significance of the grove and identifies specific ways in which the Athlete Center's design takes this significance into consideration. For example, the design calls for safeguarding the area's natural water supply and drainage and incorporates extensive new plantings, including 129 new trees, within the grove and on the proposed rooftop plaza.

the demolition or moving of three 19th-century homes located at 2526 Durant Avenue and 2241 and 2243 College Avenue in central Berkeley (the Durant and College Avenue houses), and (2) the findings with respect to project alternatives which, according to appellants, improperly defend the EIR's "all-or-nothing approach to each group of alternatives."

Appellants are correct that one of the Regents' findings in support of the EIR discloses a "significant adverse effect" on cultural resources based on the possibility that two College Avenue houses could be demolished to create space for the proposed Law and Business Connection Building. However, the Regents also identify and adopt two measures to mitigate this adverse effect.

First, under Mitigation Measure CUL-IP-10a, the "University could undertake or sponsor the relocation and rehabilitation of the College Avenue Houses. They could be moved to a site owned by the University or could be sold or donated to another owner. It would be possible to rehabilitate them for their current use or as housing. If the two houses were sited together in an appropriate manner, it would be possible to rehabilitate them to meet the criteria consideration for moved buildings of the National Register. This would mitigate the impact to a *less than significant* level for the houses."

Second, under Mitigation Measure CUL-IP-10b, the "houses, . . . and their associated landscapes could be recorded to the standards of the Historic American Building Survey and Historic American Landscape Survey ('HABS' and 'HALS'), with the documentation approved and accepted into the HABS and HALS repository . . . . Demolition of the houses . . . would remain a *significant unavoidable* impact."

In addition, when discussing cumulative impacts on cultural resources, the Regents made a related finding with respect to removal of the Durant and College Avenue houses: "The City of Berkeley General Plan EIR concluded that implementation of the General Plan would not result in any significant impacts to cultural and historic resources. Moreover, most of the planned City projects do not share historic significance with the Integrated Projects. One possible exception is the demolition or moving of houses at 2526 Durant Avenue and 2241 and 2243 College Avenue. These three houses are examples of a declining stock of 19th century homes in the central Berkeley area, and their removal could represent a significant cumulative impact on cultural resources."

Appellants claim these findings with respect to the Durant and College Avenue houses lack adequate evidentiary support. We disagree. First, although removal of the College Avenue houses, if it were to occur, would be a significant adverse impact, the Regents have adopted mitigation measures,

including possible relocation and rehabilitation of the houses, to reduce this impact to "less than significant." (See Guidelines, § 15091, subd. (a)(1).) Second, while removal of these houses together with the Durant Avenue house could have a significant *cumulative* impact on cultural resources, as the trial court found, any decision to remove the Durant Avenue house would need to be made by the City rather than the University. Appellants have offered no basis for disregarding this finding. Thus, given their lack of control over this potentially cumulative impact, we cannot fault the Regents for not doing more to address it. (Guidelines, § 15091, subd. (a)(2).)

Turning to the Regents' findings with respect to project alternatives, appellants claim they are inadequate because they offer no reassurance that "alternatives to the Integrated Projects were considered in any meaningful way." Further, appellants claim these findings amount to a defense of the University's failure to *"match project-specific problems with project-specific solutions"* in the EIR's alternatives discussion.

We believe this argument by appellants merely rehashes one already considered and rejected by this court—that the EIR's analysis of project alternatives was somehow deficient because components of the alternatives were grouped together and compared to the Integrated Projects as a whole. (See pp. 274–277, *ante.*) Given our extensive handling of this issue above, we see no need to revisit it.

### 10. *Adequacy of the Statement of Overriding Considerations.*

CEQA requires a lead agency "to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits . . . of a proposal project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered 'acceptable.' " (Guidelines, § 15093, subd. (a).) Under section 21081, subdivision (b), where specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in an EIR infeasible, the agency must make a finding that specific overriding economic, legal, social, technological, or other project benefits outweigh the significant effects on the environment. (§ 21081, subd. (b).) The agency's statement of overriding objectives must be supported by substantial evidence. (§ 21081.5; Guidelines, § 15093.)

Here, appellants contend the Regents' statement of overriding objectives is not supported by substantial evidence because "[i]t rests on findings that *never mention* the Athlete Center's destruction of 91 mature trees, including

42 'specimen' trees of significant historic, education and aesthetic value" due to the Athlete Center's construction.

Again, appellants are essentially restating an argument we have rejected elsewhere in this opinion—that the Regents' treatment of potential impacts to biological resources at the site of the proposed Athlete Center was somehow inadequate. (See pp. 280–283, *ante.*) For reasons already provided, we find substantial evidence supports the University's conclusions that the trees in the Memorial Oak Grove at the Athlete Center site are not "sensitive biological resources," and thus that the EIR need not discuss the environmental impact of removing or replacing them. (See §§ 21002.1, subd. (e), 21081; Guidelines, § 15064, subd. (b).) Moreover, independent of its legal obligations under CEQA, the University continues to implement the Campus Specimen Tree Program in order to reduce adverse impacts to specimen trees at the project sites. Accordingly, because the University complied with CEQA in addressing impacts to biological resources, we decline to revisit the issue.

11. *Approval of the Athlete Center Project Before EIR Certification.*

Appellants further contend the Regents violated CEQA by approving the Athlete Center project before completing its environmental review of the project.

Whether a lead agency prematurely approves a project before preparing and considering an EIR for the project " 'is predominantly one of improper procedure' . . . to be decided by the courts independently." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131 [84 Cal.Rptr.3d 614, 194 P.3d 344], citation omitted (*Save Tara*), quoting *Vineyard Area, supra,* 40 Cal.4th at p. 435.) In conducting this independent review, the following rules are relevant.

"All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." (§ 21100, subd. (a).) "No state agency . . . shall request funds, nor shall any state agency . . . which authorizes expenditures of funds, other than funds appropriated in the Budget Act, authorize funds for expenditure for any project, other than a project involving only feasibility or planning studies for possible future actions which the agency . . . has not approved, adopted or funded, which may have a significant effect on the environment unless such request or authorization is accompanied by an environmental impact report." (§ 21102.) "The exact date of approval of any project is a

matter determined by each public agency according to its rules, regulations, and ordinances." (Guidelines, § 15352, subd. (a).)[34]

**(27)** Relying upon these rules, the Regents point out that, under section 21102, an agency may, without an accompanying EIR, request funds or authorize expenditures of funds on projects "involving only feasibility or planning studies for possible future actions which the agency . . . has not approved, adopted or funded . . . ." In this case, the Regents argue, their November 16, 2006 decision was not final approval of the Athlete Center; rather, it was approval of the project's budget. As such, the Regents argue, their decision came within section 21102's exception that allows an agency to authorize expenditure of funds on a project "involving only feasibility or planning studies for possible future actions," before the agency has certified the EIR. (§ 21102.) We agree with this reasoning.

As the trial court noted, the University has enacted the "Policy on Approval of Design, Long Range Development Plans, and the Administration of [CEQA]" (UC CEQA policy). This policy dictates that approval of a project's design, not approval of a project's budget, constitutes final "approval" for purposes of CEQA. (UC CEQA policy, § 2.3.15 ["Design approval has been determined to be the irrevocable commitment to proceed with a project."]; see also Guidelines, § 15352, subds. (a), (b).) The trial court pointed out that, consistent with this policy, the University prohibits the expenditure of any funds for construction of a capital project before the project's EIR is certified and its design is approved, but not expenditure of funds for a project's initial planning and feasibility studies. (University of Cal., Office of the President, Facilities Manual.)

Given that an agency's own rules and regulations determine the exact date of a project's approval (Guidelines, § 15352, subd. (a)), we accept December 5, 2006, when the Regents approved the Athlete Center's design, rather than November 16, 2006, when the Regents approved the project's budget, as the final approval date for purposes of complying with CEQA. Further, because the Regents also certified the EIR on December 5, 2006, the agency complied with section 21102's requirement that an EIR accompany the agency's authorization of the expenditure of funds for environmentally significant

---

[34] Similar to section 21102, Guidelines section 15352 provides: "(a) 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval. [¶] (b) With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subds. (a), (b).)

projects. Thus, given the Regents' technical compliance with these rules, we will affirm their approval of the Athlete Center project so long as their consideration of the accompanying EIR was reasonable and not simply a "*post hoc* rationalization[] to support action already taken." (*Laurel Heights I, supra*, 47 Cal.3d at p. 394.) On this record, we conclude this governing standard was met.

In particular, the Regents' December 5, 2006 approval of the Athlete Center project and certification of the EIR followed a lengthy, interactive planning and review process, which we have already discussed at length. To summarize, the Regents identified and analyzed the project's significant environmental impacts; identified and analyzed alternatives and mitigation measures responsive to those impacts; actively solicited public comments; held multiple public hearings; and considered and responded to extensive public feedback, including written comments from eight public agencies and 55 organizations and individuals and two petitions with over 1,000 signatures. As the evidence reflects, this is not a case where, before conducting the environmental review, "an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project . . . ." (*Save Tara, supra*, 45 Cal.4th at p. 135.) Rather, in performing its statutory and regulatory obligations before ultimately approving the Athlete Center, the Regents acted reasonably, in good faith, and consistent with the intent and purpose of CEQA. We thus conclude the Regents committed no violation of CEQA in this regard.

As our Supreme Court instructs, "CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Save Tara, supra*, 45 Cal.4th at p. 137.) Accordingly, having rejected this challenge, we proceed to the next one.

12. *Delegation to the Committee on Grounds and Buildings.*

Appellants next contend the Regents failed to proceed in the manner required by law by delegating the authority to certify the EIR to the Committee on Grounds and Buildings (the Committee), one of seven standing committees through which the Regents operate. The following rules are relevant to this contention.

CEQA requires an EIR to be prepared "directly by, or under contract to, a public agency." (§ 21082.1.) Further, the "lead agency" is "the public agency which has the principal responsibility for carrying out or approving a

project" which may have a significant effect on the environment. (Guidelines, § 15367.) The "draft EIR which is sent out for public review must reflect the independent judgment of the lead agency." (Guidelines, § 15084, subd. (e).) Thereafter, before approving a project, the lead agency must certify that: "(1) The final EIR has been completed in compliance with CEQA; [¶] (2) The final EIR was presented to the decisionmaking body of the lead agency and that the decisionmaking body reviewed and considered the information contained in the final EIR prior to approving the project; and [¶] (3) The final EIR reflects the lead agency's independent judgment and analysis." (Guidelines, § 15090, subd. (a).)

In performing these tasks, the lead agency thus may present the EIR to its "decisionmaking body." (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352].) Under CEQA, the "decisionmaking body" is "any person or group of people within a public agency permitted by law to approve or disapprove the project at issue." (Guidelines, § 15356; see also *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1349–1350 [19 Cal.Rptr.3d 445].) While the Guidelines permit staff members of the lead agency to perform certain CEQA-related tasks, including conducting initial studies and responding to public comments, other tasks are deemed nondelegable and reserved exclusively for the agency's decisionmaking body, including "[r]eviewing and considering a final EIR" and making certain findings.[35] (Guidelines, § 15025, subd. (b).)

Here, appellants contend the Regents violated these rules by delegating to the Committee the responsibility to certify the EIR, adopt findings, and approve the Athlete Center design, rather than performing those duties itself. According to appellants, the lead agency as a whole must determine the adequacy of an EIR. As such, appellants contend, it was wrong for the committee, which includes only 11 of the Regents' 26 members, to act as " 'the ultimate decision-making body' " in this case.

[35] Guidelines section 15025 provides in full: "(a) A public agency may assign specific functions to its staff to assist in administering CEQA. Functions which may be delegated include but are not limited to: [¶] (1) Determining whether a project is exempt. [¶] (2) Conducting an initial study and deciding whether to prepare a draft EIR or negative declaration. [¶] (3) Preparing a negative declaration or EIR. [¶] (4) Determining that a negative declaration has been completed within a period of 180 days. [¶] (5) Preparing responses to comments on environmental documents. [¶] (6) Filing of notices. [¶] (b) The decisionmaking body of a public agency shall not delegate the following functions: [¶] (1) Reviewing and considering a final EIR or approving a negative declaration prior to approving a project. [¶] (2) The making of findings as required by Sections 15091 and 15093. [¶] (c) Where an advisory body such as a planning commission is required to make a recommendation on a project to the decisionmaking body, the advisory body shall also review and consider the EIR or negative declaration in draft or final form." (Guidelines, § 15025.)

■ As set forth above, Guidelines section 15025 prohibits "[t]he decisionmaking body of a public agency" from delegating to agency staff the authority to certify an EIR, to make certain requisite findings, and to give final approval to a project. Further, while, as appellants point out, Guidelines section 15090, subdivision (a), states that the "lead agency" must certify the EIR, subdivision (b) of the same provision states that, "[w]hen an EIR is certified by a non-elected decision-making body within a local lead agency, that certification may be appealed to the [agency's] elected decision-making body, if one exists." (Guidelines, § 15090, italics added; see also Pub. Resources Code, § 21151, subd. (c).) Thus, Guidelines section 15090, subdivision (b), like Guidelines section 15025, clearly anticipates that the agency's decisionmaking body, rather than the agency as a whole, will undertake EIR certification. Indeed, reading subdivision (a) of Guidelines section 15090 to prohibit delegation of this duty to the agency's decisionmaking body would render subdivision (b) of the same provision nonsensical. Under well-established authority, we decline to "give an unreasonable construction to the statute." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ Moreover, consistent with our interpretation, the Office of Planning and Research has prepared a note for Guidelines section 15090, which provides as follows: "The section omits any mention of delegating the certification functions. Instead, the responsibility for certification rests with the Lead Agency. This approach allows Lead Agencies to determine for themselves how they will assign responsibility for completing the certification." We see no sound reason in law or policy why, at least as a general matter, the agency, pursuant to this section, cannot "determine for themselves" that a committee of its members is the proper body to complete the certification. Indeed, section 15022 of the Guidelines allows just that, requiring a lead agency to adopt specific procedures for complying with CEQA, including "[a]ssigning responsibility for determining the adequacy of an EIR," and "[r]eviewing and considering environmental documents by the person or decision making body who will approve or disapprove a project." (Guidelines, § 15022, subd. (a)(8), (9).)

Thus, applying these relevant Guidelines to this case, we simply must determine whether the Regents properly designated the Committee as the decisionmaking body responsible for certifying the EIR, making the requisite findings and approving the Athlete Center. For this, we return to the record.

Under the Regents' bylaws, the " 'Regents of the University of California' means the Board of Regents of the University of California and its standing and special committees or subcommittees, other than groups of not more than three regents appointed to advise and assist the President in contract negotiations." (Bylaws of Regents of Univ. of Cal., Bylaw § 14.6; see also Ed. Code,

§ 92020.) Further, under the UC CEQA policy, "certification or adoption of environmental documents is undertaken at the level of the associated project approval." (UC CEQA policy, § 5; see also Guidelines, § 15022.) Where design approval is sought for building projects costing in excess of $10 million, the UC CEQA policy identifies the Committee as the appropriate decisionmaking body, unless the project qualifies under one of three exceptions.[36] (UC CEQA policy, § 1.)

Here, the Integrated Projects as a whole, and the Athlete Center by itself, are projects with total building costs in excess of $10 million. Moreover, they do not qualify under any of the following exceptions—"alterations or remodeling where the exterior of the building is not materially changed," "buildings or facilities located on agricultural, engineering, or other field stations," or "agriculture-related buildings or facilities located in areas of campus devoted to agricultural functions." (UC CEQA policy, § 1.) Accordingly, under the UC CEQA policy, the projects were subject to design approval by the Committee, and "certification or adoption of environmental documents [was to be] undertaken at the level of the associated project approval." (UC CEQA policy, § 5.) As the trial court properly read the UC CEQA policy, the Committee, as the decisionmaking body authorized to approve the Integrated Projects, was also the decisionmaking body authorized to certify the EIR for those projects. (*Ibid.*)

Moreover, the record reflects that the Regents fully complied with these policies here. On November 14, 2006, the Committee held a hearing to consider an agenda item recommending, among other things, that the Regents certify the EIR for all of the Integrated Projects and approve the Athlete Center project. Following the hearing, the Committee adopted a recommendation that the Regents approve the approximately $112 million budget for the Athlete Center, but deferred consideration of the EIR and the Athlete Center design until the week of December 4, 2006. On the same day, the Regents, sitting as a whole, heard public comments on the proposed Integrated Projects, including the Athlete Center project. Two days later, the Regents adopted the Committee's recommendation to approve the Athlete Center budget. Then, on December 5, 2006, a public hearing was held, after which

---

[36] There are certain exceptions to this policy that are not relevant here. Specifically, UC CEQA policy, section 1, provides as follows:

"The Regents designates the following categories of projects as requiring design approval by the Committee on Grounds and Buildings:

"(a) Building projects with a total project cost in excess of $10,000,000, except when such projects consist of the following: (i) alterations or remodeling where the exterior of the building is not materially changed; (ii) buildings or facilities located on agricultural, engineering, or other field stations; or (iii) agriculture-related buildings or facilities located in areas of campus devoted to agricultural functions.

"(b) Capital Improvement projects of any construction cost when, in the judgment of the President, a project merits review and approval by the Regents because of budgetary matters, fundraising activities, environmental impacts, community concerns, or other reasons."

the Committee certified the EIR, approved certain findings of fact, and approved the Athlete Center design. Finally, on December 7, 2006, pursuant to Guidelines section 15094, the University filed a notice of determination that the Regents had approved the Athlete Center project and certified the EIR.

Based on this record, we conclude the EIR was presented to the Committee, the proper decisionmaking body of the Regents for purposes of CEQA, which thereafter complied with its statutory duty to independently review and consider the document before adopting relevant findings and approving the Athlete Center project. (See *El Morro Community Assn. v. California Dept. of Parks & Recreation, supra,* 122 Cal.App.4th 1341, 1350 [because the department acts through its director or his or her designee (§ 546), there was no error in authorizing the department's deputy director to act as the "decisionmaking body" in certifying an EIR]; cf. *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770, 778–779 [128 Cal.Rptr. 781] [requiring "the decisionmaking body or administrative official having final approval authority over a project" to "review and consider an EIR before taking action to approve or disapprove the project"].) Accordingly, we reject appellants' contrary argument.

III. *The Award of Costs.*

There remains one final issue for our consideration—whether the trial court's award of over $51,000 in costs to the University for preparing and copying the administrative record was reasonable. The following legal principles govern our inquiry.

When a CEQA action is filed, the plaintiff or petitioner must file a request that the respondent public agency prepare a record of the proceedings relating to the subject of the action. (§ 21167.6, subd. (a).) Alternatively, the petitioner may prepare the record itself and then have the agency certify it. (§ 21167.6, subd. (b)(2).) If request is made upon the agency, the agency has 60 days from the date of the request to prepare and certify a record of the proceedings, and to lodge a copy with the court. (§ 21167.6, subd. (b).) The parties are required to pay "any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court." (*Ibid.*)

"In preparing the record of proceedings, *the party preparing the record shall strive to do so at reasonable cost in light of the scope of the record.*" (§ 21167.6, subd. (f), italics added.) This provision serves the dual purposes of containing costs and expediting CEQA litigation. (*St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th

989, 1019 [75 Cal.Rptr.3d 213]; *Hayward Area Planning Assn. v. City of Hayward* (2005) 128 Cal.App.4th 176 [26 Cal.Rptr.3d 783] (*Hayward Area*).)

 Superior Court of Alameda County Local Rules, rule 3.320(a) (hereinafter, Local Rule 3.320(a)) imposes additional requirements for recovering costs in CEQA actions that are relevant here.[37] In particular, this rule requires a public agency receiving a request to prepare the record to personally serve on the petitioner a preliminary notice of the estimated cost of preparation that includes the agency's normal costs per page, other anticipated reasonable costs, and the likely range of pages. (Local Rule 3.320(a).) The agency then must supplement this notice of preparation "from time to time as additional documents are located or determined appropriate to be included in the record." (*Ibid.*) It is this specific requirement under Local Rule 3.320(a) that appellants contend the Regents violated in this case.

Below, on January 17, 2007, pursuant to Local Rule 3.320(a), the University served on appellants a document entitled Preliminary Notification of Estimated Costs of Preparation of Administrative Record, which identified $6,490 as the estimated cost for staff time to gather, organize, and index the record, and $17,670 as the estimated cost for copying the record, resulting in a total estimated cost of $24,160. Then, on March 1, 2007, the University served on appellants a revised notice, which identified $7,680 as the estimated cost for staff time in preparing the record, and $16,514.50 as the estimated cost for copying, for a total estimated cost of $24,194.50.

On April 20, 2007, appellants stipulated that the University would copy and lodge the administrative record, which the University subsequently did without amending the notice of estimated costs that had been provided to appellants in March of 2007. According to appellants, in making this stipulation, they understood the University would adhere to that cost estimate, and thus would charge only $7,680 for gathering and organizing the record and preparing a draft index. Instead, the University charged $51,442.63, an amount including $46,563.43 for labor in compiling the record and $4,879.20 for copying the record. Under these circumstances, appellants claim it was error for the trial court to award the University a total of $51,442.63 for performing these tasks. Appellants thus ask us to reduce the award to $13,106.21—to wit, $7,680 for preparing the record and $5,426.21 for preparing trial exhibits. The following standard of review governs.

"Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court.

---

[37] Effective July 1, 2007, Superior Court of Alameda County, Local Rules, rule 5.11 was amended and renumbered to rule 3.320.

[Citations.] Discretion is abused only when, in its exercise, the court 'exceeds the bounds of reason, all of the circumstances being considered.' (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) The appellant has the burden of establishing an abuse of discretion. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].)" (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 181 [43 Cal.Rptr.2d 501] (*River Valley*).)

Here, the trial court found that "Respondents' costs were mostly reasonable, given the size of the administrative record and the amount of work it took to compile the record. In addition, Respondents are entitled to recover the costs of producing one hard copy of the record, based on its showing that the additional copy was reasonably necessary to the conduct of the litigation. (See *Wagner Farms Inc. v. Modesto Irrigation Dist.* (2006) 145 Cal.App.4th 765, 776–777 [52 Cal.Rptr.3d 683].)"[38] However, the trial court did not unequivocally grant the Regents' request for costs. Rather, the trial court limited their recovery in three significant ways. First, the trial court disallowed any recovery for expert witness fees. Second, the trial court reduced the hourly rate claimed for the labor of a paralegal, Ana Del Simone, from $125 per hour to $70 per hour, a total reduction of $6,017, on the ground that the $70 rate, not the $125 rate, was identified in the Regents' preliminary notices of estimated costs. And third, the trial court reduced the entire award by 15 percent, or $10,036.56, on the ground that the Regents had prevailed only with respect to 85 percent of the proceedings.

Supportive of the trial court's rulings, the record reflects that Jennifer McDougall, the University's principal planner for the Athlete Center, was in charge of retrieving and organizing the documents for the administrative record. These tasks, substantial in any event, were made more difficult by the relevance of both CEQA and the Alquist-Priolo Act, and of both the Integrated Projects EIR and the 2020 LRDP EIR. In the end, McDougall and her staff spent over 393.5 hours through March of 2007 preparing the record from documents located in many different departments throughout campus.

In addition, Del Simone, the University's paralegal, was in charge of assembling and indexing the documents in the record. These tasks, which included preparing a 65-page index, took over 91 hours during February and March of 2007. Afterward, counsel for both the University and the City reviewed the record and indices at the University's offices, requiring additional time from Del Simone. Del Simone and University counsel also spent

---

[38] As the Regents point out, appellants have not challenged the trial court's ruling that the costs of producing one additional hard copy of the record were recoverable. Accordingly, we address it no further.

several hours addressing errors, including mislabeling and incorrect pagination, in an electronic copy of the record generated by a copying service retained by appellants.

Ultimately, University personnel familiar with the Integrated Projects and the 2020 LRDP EIR retrieved, reviewed, organized, and indexed over 40,000 pages of documents—nearly 1,400 documents in 11 boxes—for the administrative record.

As should now be abundantly clear, these proceedings have an extensive history and complex nature. Under such circumstances, it is not surprising the University spent a great deal of time and expense ensuring the entire administrative record was prepared and copied in an appropriate manner. As such, we cannot say the trial court exceeded the bounds of reason in accepting as reasonable the hours and rates claimed by the University for performing these necessary tasks. (See *River Valley, supra*, 37 Cal.App.4th 154, 181–182 [affirming cost award of $10,194.05 where the agency prepared a record containing six volumes and nearly 4,000 pages of documents spanning 10 years].)

Moreover, we find appellants' authority for arguing to the contrary, *Hayward Area, supra*, 128 Cal.App.4th 176, distinguishable. There, our colleagues in Division Five of the First District reversed an award of costs in a CEQA action because, in violation of section 21167.6, the public agency did not directly incur any liability for preparing the record, but rather delegated the task to a third party with an interest in the litigation, which was not subject to the statutory scheme designed to control record preparation costs in CEQA actions. (*Hayward Area, supra*, at pp. 184–185.)

Here, there was no such improper delegation to a third party. Undisputedly, the University prepared the record itself. Moreover, there is no evidence the Regents' two preliminary notices of estimated costs were made in bad faith, or were unreasonable at the time they were provided to appellants, or that the Regents failed to act accountable to their constituents for use of public funds, even though the actual cost of preparing the record far exceeded the agency's estimates. (Cf. *Hayward Area, supra*, 128 Cal.App.4th at p. 184.) As such, *Hayward Area* provides no basis for reversing this award.

Accordingly, we conclude the trial court properly exercised its discretion in awarding the Regents $51,442.63 in costs for preparing and copying the administrative record.

## DISPOSITION

Having found no basis for setting aside the Regents' certification of the EIR or their approval of the Athlete Center project, we affirm the trial court's denial of the writ of mandate and award to the Regents of $51,442.63 for costs expended in preparing and copying the administrative record. The judgment stands.

McGuiness, P. J., and Siggins, J., concurred.

On October 1, 2010, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied December 15, 2010, S187332.